PLANNED PARENTHOOD ASSOCIATION et al., Plaintiffs,

Obstetrical Society of Philadelphia, Intervenor-Plaintiff,

v.

F. Emmett FITZPATRICK, Jr., and Frank S. Beal, Defendants,
and
Robert P. Kane and the Commonwealth of Pennsylvania, Intervenor-Defendants.

Civ. A. No. 74-2440.

United States District Court,
E. D. Pennsylvania.

Sept. 4, 1975.

Sharon K. Wallis, Roland Morris, Philadelphia, Pa., for plaintiffs.

Bonnie Brigance Leadbetter, Asst. Dist. Atty., Philadelphia, Pa., Mansmann & Mansmann, Pittsburgh, Pa., for defendants.

## OPINION

Before ADAMS, Circuit Judge and NEWCOMER and GREEN, District Judges.

CLIFFORD SCOTT GREEN, District Judge.

This action comes before this Court upon a complaint challenging the constitutionality of the recently enacted Pennsylvania abortion statute, titled the "Abortion Control Act,"[1] Act No. 209 (P.L. ——)[2]. Plaintiffs contend that the overriding purpose and dominant effect of the statute under attack is to discourage and interfere with certain clearly defined, constitutionally protected rights of the plaintiffs. Thus, they claim the statute should be invalidated in its entirety, despite the presence of a severability clause. Plaintiffs seek declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 and jurisdiction is invoked under 28 U.S.C. § 1343.

On September 26, 1974, a three-judge court was designated on plaintiffs' application and pursuant to 28 U.S.C. § 2281. Oral argument on the plaintiffs' application for a preliminary injunction was heard on October 9, 1974, and a preliminary injunction was entered on October 10, 1974, which enjoined the enforcement of Sections 3(b)(i), 3(b)(ii), 3(e), 5(a), 5(d), 6(b), 6(c) except as it requires a licensed physician to perform an abortion within the Commonwealth of Pennsylvania, 6(d), 6(i) except as it relates to 6(f), 7, and the definitions of "viable" and "informed consent" in Section 2. Also on October 10, 1974, this Court granted leave to the Obstetrical Society of Philadelphia to intervene as a party plaintiff.

On December 4, 1974, the plaintiffs filed a motion seeking a class action determination. Physician plaintiffs contended that the members of the proposed class "included, not only physicians who regularly perform abortions, but also those who may, in the course of their practice, be called upon to counsel their patients with regard to the option of abortion, which necessarily includes virtually all physicians who practice in the Commonwealth of Pennsylvania." Plaintiffs also contended that the members of the proposed subclass included board-certified obstetrician-gynecologists, who were members of the Obstetrical Society of Philadelphia, and who maintained their medical practice in Pennsylvania. The physician class plaintiffs allege that enforcement of the Abortion Control Act would "abridge their constitutionally protected rights: (1) to practice medicine in a manner consistent with the highest standards of their profession, (2) to be protected from unconstitutional intrusion of the physician-patient relationship in the decision making and treatment of pregnancy, and (3) the rights of their patients to terminate pregnancies under the conditions set forth in the Supreme Court opinions in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973)." On December 10, 1974 this Court certified the instant action to be a class action.

This matter came before the Court for final hearings on the merits from January 13, 1975 through January 17, 1975 and on March 10, 1975. Thereafter, we granted the motions of the Attorney General of Pennsylvania and of the Commonwealth of Pennsylvania to intervene as parties defendant.

Plaintiff Planned Parenthood Association of Southeastern Pennsylvania, Inc. is a voluntary, non-profit health and so-

---

1. The Act was enacted over the Governor's veto on September 10, 1974 and took effect on October 10, 1974.

2. 35 P.S. § 6601 et seq.

cial service agency, incorporated by the state of Pennsylvania. Planned Parenthood, which has 200 affiliates in the United States and is a member of Planned Parenthood/World Population, is dedicated to providing contraceptive information and family planning service. Planned Parenthood through its various departments, including its medical staff, provides and desires to continue providing services and/or referral guidance with respect to contraception, sterilization or abortion; maintaining in each of these efforts the goal of freedom of choice concerning family size and birth control methods. Planned Parenthood is completing plans to build and operate an abortion clinic, but at the present time it does not perform abortions at any of its facilities.

Plaintiff Dr. John Franklin is a licensed medical doctor practicing in the state of Pennsylvania, board-certified in obstetrics and gynecology. Dr. Franklin is a member of the staff at Thomas Jefferson University Hospital, the medical director of plaintiff Planned Parenthood Association of Southeastern Pennsylvania, Inc., the medical director of Booth Memorial Hospital of the Salvation Army, and a member of the intervening plaintiff Obstetrical Society of Philadelphia. In his capacity as medical director of Planned Parenthood, he supervises the operation of its clinic which provides family planning services, including birth control, pregnancy testing, pregnancy counselling and referral. In the calendar year 1974, Dr. Franklin performed 21 abortions through November 20th; and in the calendar year 1973, he performed 24 abortions. In 1971 and 1972, Dr. Franklin was the medical director of Philadelphia Family Planning, Inc., where he did approximately 10 to 12 abortion procedures a week for one year.

Plaintiff Concern for Health Options: Information, Care and Education, Inc. (CHOICE) is a non-profit corporation organized under the laws of the Commonwealth of Pennsylvania in 1974.

CHOICE provides counselling and referral for pregnant women; and over 1,000 women have been seen at eight centers in and around Philadelphia. In addition to its counselling and referral program, CHOICE performs ongoing evaluation of the services available to pregnant women, especially medical services. CHOICE publishes a "Resource and News Bulletin" which is distributed to its counsellors, all social service agencies which assist women with problem pregnancies, and other interested persons.

Plaintiff Clergy Consultation Service of Northeast Pennsylvania is a voluntary organization of clergy and women, who provide free counselling and referral for pregnant women. Clergy Consultation Service counsellors assist approximately 50 women per month, at three sites located in Scranton, Wilkes-Barre and Hazelton. Most of these counselled women are medically indigent, most are under 21 years of age, and most of them are single.

Intervening plaintiff Obstetrical Society of Philadelphia is a voluntary professional association of board-certified obstetricians and gynecologists; formed more than one hundred years ago to represent and protect the professional interests of members of these medical specialties in the Philadelphia area. The Society has over four hundred members who practice obstetrics and gynecology in the Greater Delaware Valley, including Philadelphia, eastern Pennsylvania, Delaware and southern New Jersey.

Defendant F. Emmett Fitzpatrick, Jr., is the District Attorney of Philadelphia County, and he is sued in his official capacity. In his official capacity defendant Fitzpatrick is responsible for the enforcement in Philadelphia of the laws of the Commonwealth of Pennsylvania, including the Abortion Control Act.

Defendant Frank S. Beal is the Secretary of Welfare of the Commonwealth of Pennsylvania, and he is sued in his official capacity. In his official capacity defendant Beal is responsible for the conduct of the Commonwealth's Medical

Assistance program, including implementing the restrictions imposed upon that program by the Abortion Control Act.

Intervening defendant Robert P. Kane is the Attorney General of the Commonwealth of Pennsylvania, and he is sued in his official capacity. In his official capacity intervening defendant Kane is the legal advisor of the Governor and the chief law officer of the Commonwealth.

For the reasons hereinafter stated, this Court holds that the following challenged sections of the Abortion Control Act and the related criminal sanctions are unconstitutional: the definition of "viable" found in Section 2; the spousal consent requirement found in Section 3(b)(i); the parental consent requirement found in Section 3(b)(ii); the determination of viability requirement found in Section 5(a); the performance of an abortion requirements found in Section 6(b); part of the reporting requirements found in Section 6(d); the prohibition of advertising requirement found in Section 6(f); and finally, the subsidizing of an abortion requirement found in Section 7. And for the reasons hereinafter stated, we hold that the following challenged sections of the Act and the related criminal sanctions are constitutional: the definition of "informed consent" found in Section 2; the informed consent requirement found in Section 3(a); the disposition of dead fetuses requirement found in Section 5(c); the determination of pregnancy requirement found in Section 6(a); the facility approval requirement found in Section 6(c); part of the reporting requirements found in Section 6(d); and finally, the Health Department regulation requirements found in Section 8.

### I. Justiciability

The threshold question for consideration is the justiciability of the instant litigation. The state challenges plaintiffs' standing to contest the validity of the challenged statute in this case which lacks, as a party, a pregnant woman who has been denied an abortion. Initially the state contends that the plaintiff-physicians have no standing to bring this action. Standing, of course, entails

. . . such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions. *Baker v. Carr*, 369 U.S. 186, at 204, 82 S.Ct. 691, at 703, 7 L.Ed.2d 663 (1962).

The state defendants appear to have overlooked the Supreme Court's treatment of a physician's standing in *Roe*, wherein the Court stated at 410 U.S. 188, 93 S.Ct. 745:

We conclude, however, that the physician-appellants, who are Georgia-licensed doctors consulted by pregnant women, also present a justiciable controversy and do have standing despite the fact that the record does not disclose that any one of them has been prosecuted, or threatened with prosecution, for violation of the State's abortion statutes. The physician is the one against whom these criminal statutes directly operate in the event he procures an abortion that does not meet the statutory exceptions and conditions. The physician-appellants, therefore, assert a sufficiently direct threat of personal detriment. They should not be required to await and undergo a criminal prosecution as the sole means of seeking relief. [Citations omitted.]

We hold that the plaintiff-physicians in the case, *sub judice,* are not required to risk becoming defendants in criminal prosecutions since they have standing under the rationale of *Roe.*

We have previously determined that the physician plaintiffs may maintain this action on behalf of themselves and "the class of Pennsylvania physicians who perform abortions and/or

counsel their female patients with regard to family planning and pregnancy including the option of abortion, and the sub-class of members of the Obstetrical Society of Philadelphia who practice in Pennsylvania." The evidence establishes that the physicians included in the class have patients who are married and desire abortions without spousal consent, patients who are minors and seek abortions without parental consent and patients who are indigent and must rely on Medical Assistance for payment of the costs of abortions.[3] Accordingly, we consider the instant action to be maintained on behalf of the class physicians and their patients in these three categories.

■ The state also contends that the plaintiff-referral agencies (i. e. Planned Parenthood Association of Southeastern Pennsylvania; Concern for Health Options: Information, Care and Education, Inc.; and Clergy Consultation Service of Northeastern Pennsylvania) have no standing to bring this action. Few would dispute that a referral agency actually threatened with prosecution as a counselor-conspirator or accessory in violation of the Abortion Control Act would have standing to seek a declaratory judgment of the constitutionality of the statute. Cf., *Doe, supra,* 410 U.S. at 189, 93 S.Ct. at 746. However, absent such threatened prosecution, it is more difficult to find that these plaintiffs do have standing. "The sole issue is whether there is a logical link between the status they assert . . . and the claim they seek adjudicated, or between their status and both the type of enactment attacked and the nature of the constitutional infringement alleged." *Doe v. Bolton,* 319 F.Supp. 1048, at 1052 (N. D.Ga.1970). As referral agencies, plaintiffs attack a criminal statute potentially applicable to them that would subject them to significant criminal penalties; accordingly, we hold they have standing.

■ Standing is one aspect of justiciability. However, Article III of the United States Constitution limits the jurisdiction of the federal courts to "cases and controversies". It is well established that in actions for declaratory judgments, there must be "exigent adversity"; i. e., an actual controversy in which the constitutionality of the statute is drawn into question in a truly adversary context. See, e. g., *Golden v. Zwickler,* 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).

■ Looking at the evidence of record presently before us, it is clear that the physicians, both individually and as a class, have established a concrete adverseness; for they are the ones whom the Abortion Control Act would *directly* penalize. However, the plaintiff-referral agencies have presented no evidence to support their contention that they may be prosecuted as counsel-conspirators or accessories, and this Court finds, after reading the Act and noting the barren state of the record, that such a conclusion could only be reached as a matter of pure speculation or conjecture on our part. Consequently, we hold that the claims of the plaintiff-physicians in this case present a justiciable controversy, while the claims of the plaintiff-referral agencies do not. Accordingly, we dismiss as to the referral agencies.

## II. Analysis of Roe and Doe

The landmark decisions in the abortion area, which of necessity we must follow in a resolution of the case presently before us, are *Roe v. Wade, supra,* and *Doe v. Bolton, supra.*

Accordingly, we apply the mandate of the Supreme Court to the legislation presently before us. Part of that mandate appears at the end of the opinion in *Roe, supra,* 410 U.S. at 164–66, 93 S.Ct. at 732–33, where Mr. Justice Blackmun stated:

To summarize and to repeat:

1. A state criminal abortion statute of the current Texas type, that excepts from criminality only a *life-sav-*

---

3. See testimony of Drs. Franklin, Gerstley, Osofsky, Klaven and Matthews.

*ing* procedure on behalf of the mother, without regard to pregnancy stage and without recognition of the other interests involved, is violative of the Due Process Clause of the Fourteenth Amendment.

(a) For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician.

(b) For the stage subsequent to approximately the end of the first trimester, the State, in promoting its interest in the health of the mother, may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health.

(c) For the stage subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.

2. The State may define the term "physician," as it has been employed in the preceding paragraphs of this Part XI of this opinion, to mean only a physician currently licensed by the State, and may proscribe any abortion by a person who is not a physician as so defined.

In *Doe v. Bolton,* 410 U.S. 179 [93 S. Ct. 739, 35 L.Ed.2d 201], procedural requirements contained in one of the modern abortion statutes are considered. That opinion and this one, of course, are to be read together. · · ·

[This] decision leaves the State free to place increasing restrictions on abortion as the period of pregnancy lengthens, so long as those restrictions are tailored to the recognized state interests. The decision vindicates the right of the physician to administer medical treatment according to his professional judgment up to the points where important state interests provide compelling justifications for intervention. Up to those points, the abortion decision in all its aspects is inherently, and primarily, a medical decision, and basic responsibility for it must rest with the physician. If an individual practitioner abuses the privilege of exercising proper medical judgment, the usual remedies, judicial and intra-professional, are available.

■ The language of the *Roe* decision clearly indicates that the Supreme Court reached its decision by making the following determinations: 1) there is a fundamental right to privacy; 2) this right encompasses the pregnant woman's decision to have an abortion; 3) being a fundamental right, the right to an abortion can be limited only by a compelling state interest; 4) the state has a compelling interest in the mother's health which arises approximately at the end of the first trimester of pregnancy; and 5) the state has a compelling interest in the life of the fetus when it becomes viable.

As the Supreme Court stated in its *Roe* decision, *Roe* should be read in conjunction with *Doe v. Bolton.* Thus in *Doe* the Court invalidated in part a more modern Georgia abortion statute because: 1) with respect to certain statutorily imposed requirements, the challenged statute failed to exclude the first trimester of pregnancy; 2) with respect to certain other statutorily imposed requirements, the state failed to prove that the statutory restriction was rationally connected to the objective the state sought to accomplish; and 3) with respect to other provisions, the statutorily imposed overview caused the abortion procedure to be regulated more strictly than any other medical or surgical procedure.

### III. Burden of Proof

One overall issue that pervades this entire case, and which the parties have continually raised, is the question of burden of proof. The Supreme Court's

decision in *Roe* clearly states that the pregnant woman's decision to have an abortion is a fundamental right which may be limited only at certain compelling points by legitimate state interests. In this regard, Mr. Justice Blackmun stated in *Roe, supra,* 410 U.S. at 155, 93 S.Ct. at 728:

> Where certain "fundamental rights" are involved, . . . regulation[s] limiting these rights may be justified only by a "compelling state interest," . . . and . . . [these] legislative enactments must be narrowly drawn to express only the legitimate state interests at stake. . . . [Citations omitted.]

■ We hold that the burden is on the defendants to show: 1) that there exists a legitimate state interest requiring a legislative enactment, 2) the point at which this legitimate state interest becomes compelling, and 3) that the legislative enactment is narrowly drawn to express only the legitimate state interest in question.

## IV. Severability

■ Plaintiffs contend that the Abortion Control Act "is unconstitutional on its face and in its entirety on the ground that the legislative intent to unconstitutionally limit, deter, and regulate the abortion decision which is expressed in its title, language, and various provisions, vitiates the statute as a whole." Defendants argue: 1) the Act is constitutional, or in the alternative, 2) if any section is unconstitutional the statute's severability clause evidences an express legislative intent that this Court must heed.[4] Clearly the effect of the sections herein declared unconstitutional is to improperly restrict the exercise of the fundamental right of the pregnant woman, in consultation with her physician, to make the abortion decision at points in time when the state has not demonstrated a *compelling* interest justifying statutory regulation. We have examined each section of the Act and we have determined, notwithstanding the fact that a number of sections are unconstitutional, that the invalid sections are severable and the Act is not unconstitutional in its entirety. Therefore, we now turn to a section-by-section examination of the Act.

## V. Consent to Abortion

### Spousal and Parental Consent

Plaintiffs contend "the parental and spousal consent provisions of the Act and the criminal provision associated therewith are unconstitutional and invalid infringements of their rights to privacy. . . . " Defendant Fitzpatrick concedes that Sections 3(b)(i), 3(b)(ii), and 3(e) to the extent that it relates to 3(b), are unconstitutional. However, the state defendants contend the parental and spousal consent provisions are constitutional and evidence the state's legitimate interest in protecting "the long-established inherent rights of spouses and parents concerning the familial unit and child welfare." The challenged provisions are as follows:

Section 3. Consent to Abortion: Limitations on Public Officials.

· · · · · ·

(b) No abortion shall be performed upon any person in the absence of the written consent of (i) the spouse of such person provided that the whereabouts of such spouse can be learned from such person or from other readily available sources and he can be notified and that the abortion is not certified by a licensed physician to be necessary in order to preserve the life or health of the mother, (ii) one parent or person in loco parentis of such person if such person is under eigh-

---

4. The relevant provision is as follows:
Section 9. Severability.
If any provision of this act or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of this act are declared to be severable.

teen years of age and unmarried, unless the abortion is certified by a licensed physician as necessary in order to preserve the life of the mother.

. . . . . .

(e) whoever performs an abortion and without consent as required in subsections (a) and (b) of this section shall be guilty of a misdemeanor of the first degree. . . .

 We find the spousal consent provision of the Act an unconstitutional infringement of a pregnant woman's fundamental right of privacy. Initially, we note that the Supreme Court did not rule directly upon the issues of spousal or parental consent in either *Roe* or *Doe*. Thus in *Roe, supra,* 410 U.S. at 165, 93 S.Ct. at 733, the Court states in a footnote:

> Neither in this opinion nor in *Doe v. Bolton,* 410 U.S. 179 [93 S.Ct. 739, 35 L.Ed.2d 201], do we discuss the father's rights, if any exist in the constitutional context, in the abortion decision. No paternal right has been asserted in either of the cases, and the Texas and the Georgia statutes on their face take no cognizance of the father. We are aware that some statutes recognize the father under certain circumstances. North Carolina, for example, N.C.Gen.Stat. § 14–45.1 (Supp.1971), requires written permission for the abortion from the husband when the woman is a married minor, that is, when she is less than 18 years of age, 41 N.C.A.G. 489 (1971); if the woman is an unmarried minor, written permission from the parents is required. We need not now decide whether provisions of this kind are constitutional.

 Though *Roe* and *Doe* do not directly decide the issues of spousal and parental consent, this Court concludes that of necessity these decisions by implication provide the backdrop against which these interests must be viewed. The Supreme Court's analysis in *Roe* clearly states that a woman has a qualified, though not absolute, right to decide to have an abortion. The woman's decision is qualified to the extent that there must be a balancing of her fundamental right of privacy with other important and legitimate interests at specified compelling points. Thus, in *Roe, supra,* 410 U.S. at 162–63, 93 S.Ct. at 731, the Court states:

> In view of all this, we do not agree that, by adopting one theory of life, Texas may override the rights of the pregnant woman that are at stake. We repeat, however, that the State does have an important and legitimate interest in preserving and protecting the health of the pregnant woman, whether she be a resident of the State or a nonresident who seeks medical consultation and treatment there, and that it has still another important and legitimate interest in protecting the potentiality of human life. These interests are separate and distinct. Each grows in substantiality as the woman approaches term and, at a point during pregnancy, each becomes "compelling."

It is imperative, therefore, that any state regulation in the field of abortion both take cognizance of the woman's fundamental right and draw the proper balance between a legitimate state interest and the pregnant woman's interest. The challenged spousal consent provision of the Abortion Control Act is invalid because it does not balance the interest of the pregnant woman with the purported interest, if there is a constitutional one, of the husband; but rather the provision gives the spouse an unqualified and unconditional veto over the wife's decision to have an abortion, thus completely ignoring the fundamental right of the pregnant woman to make the abortion decision.

A number of other courts have come to the same conclusion and have invalidated statutorily imposed spousal consent provisions. Cf., *Doe v. Doe,* Mass., 314 N.E.2d 128 (1974); *Jones v. Smith,* 278 So.2d 339 (Fla.Ct.App.1973), *cert.*

*den.,* 415 U.S. 958, 94 S.Ct. 1486, 39 L. Ed.2d 573 (1974); *Coe v. Gerstein,* 376 F.Supp. 695 (S.D.Fla.1973), *app. dism.* and *cert. den.,* 417 U.S. 279, 94 S.Ct. 2246, 41 L.Ed.2d 68 (1974); *Doe v. Rampton,* 366 F.Supp. 189 (C.D.Utah 1973); *Doe v. Bellin Memorial Hospital,* 479 F.2d 756 (7th Cir. 1973); also see annotation at 62 ALR 3d 1097. We are aware of only one case wherein a spousal consent provision has not been invalidated, however the Supreme Court has stayed enforcement of that particular statute. See, *Planned Parenthood of Central Missouri v. Danforth,* 392 F. Supp. 1362 (E.D.Mo.1975), *stay grtd.,* 420 U.S. 918, 95 S.Ct. 1111, 43 L.Ed.2d 389 (1975).

The spousal consent provision of the Act mandates that a pregnant woman's spouse take the affirmative step of giving his consent before an abortion may be performed. We find this provision, requiring affirmative action, is not narrowly tailored to meet a legitimate interest of either the spouse or the state. Even if this Court were to find that the asserted interests of the husband were protected by the Constitution, we would still have to take cognizance of the Supreme Court's pronouncement in *Roe,* that the husband's pregnant spouse has a fundamental right to decide to have an abortion, which prior to the second trimester must be "free of interference by the State." *Roe, supra,* 410 U.S. at 164, 93 S.Ct. at 732. We need not decide here whether the husband's interest in the abortion decision is in fact protected by the Constitution. The Supreme Court has determined that the wife's interest in the abortion decision is a fundamental right. Nevertheless, the statute before us requires, in every case, that the wife obtain the consent of her spouse for an abortion; consent is required even if the spouse asserts no interest in the wife or the family, or no paternal interest in the potential child. At least one of the state defendants' witnesses has testified that though it is

oft times beneficial for the marital relationship for the husband to be informed and consulted with respect to the abortion decision, nevertheless, he should not be given absolute veto power over the wife's decision.[5] State restrictions on fundamental rights must be narrowly drawn to conform to the legitimate interests to be furthered. *Roe, supra,* 410 U.S. at 155, 93 S.Ct. at 728. Clearly the spousal consent provision of the Act is not narrowly drawn and cannot stand; we declare Sections 3(b)(i) and 3(e) to be unconstitutional.

We also find that the parental consent provision of the Act is an unconstitutional infringement of a minor woman's fundamental right of privacy in violation of the Fourteenth Amendment of the Constitution. We note that other courts have invalidated statutorily imposed parental consent provisions also. Cf., *Foe v. Vanderhoof,* 389 F.Supp. 947 (D.Colo.1975); *Baird v. Bellotti,* 393 F. Supp. 847 (D.Mass.1975); *Coe v. Gerstein,* 376 F.Supp. 695 (S.D.Fla.1973), *app. dism.* and *cert. den.,* 417 U.S. 279, 94 S.Ct. 2246, 41 L.Ed.2d 68 (1974); *Doe v. Rampton,* 366 F.Supp. 189 (S.D. Utah 1973); *Wolfe v. Schroering,* 388 F.Supp. 631 (W.D.Ky.1974). Again, we are aware of only one case wherein a parental consent provision has not been invalidated; however the Supreme Court has stayed enforcement of that particular statute. See, *Planned Parenthood of Central Missouri v. Danforth,* 392 F.Supp. 1362 (E.D.Mo.1975), *stay grtd.,* 420 U.S. 918, 95 S.Ct. 1111, 43 L. Ed.2d 389 (1975).

Initially, we agree with the analysis of the Washington Supreme Court in *State v. Koome,* 84 Wash.2d 901, 530 P.2d 260 (En Banc, 1975), where the Court states at 530 P.2d 263:

Prima facie, the constitutional rights of minors, including the right of privacy, are coextensive with those of adults. Where minors' rights have been held subject to curtailment by

---

5. See testimony of Amitai Etzioni.

the state in excess of that permissible in the case of adults it has been because some peculiar state interest existed in the regulation and protection of children, not because the rights themselves are of some inferior kind. . . . In some other cases minors' rights have been differentiated from those of adults because of a fundamental difference in the nature of the particular state interaction with juveniles.

. . . . . .

Several courts have upheld minors' privacy rights where no such special context or state interest existed. . . . Recognition of the equal status of the rights of minors seems particularly necessary with regard to the privacy rights involved here. . . . [Citations omitted.]

The state defendants argue, however, that the statute's abridgement of fundamental rights is justified by a compelling state interest not asserted in *Roe* and *Doe*. This interest is alleged to be a legitimate state interest in "safeguarding the societal role of parents in the supervision of their unemancipated minor children" and "preserving the family unit."

▆▆▆ We agree that, whenever possible, parents should be involved in the medical decisions of unemancipated minor children. However desirable it may be to have parents involved in the abortion decision, it is clear that the state may not destroy the fundamental right of the pregnant minor to make the final decision concerning abortion, provided that she is capable of making an intelligent, informed decision. The Abortion Control Act is not an attempt to encourage parental involvement, rather it destroys the right of the minor to make the abortion decision, without regard for her age, maturity, intelligence or ability to make an informed decision. It is significant that the state defendants' own

witnesses do not support the state's view that parents must invariably be involved in the decision of the pregnant minor; for when serving as counselors, defendants' witnesses do not involve the parents without the voluntary permission of the minor [6].

▆▆▆ State defendants contend that "although both adults and minors are protected by the Fourteenth Amendment, the state may impose more stringent regulations on the activities of children than it may adopt with respect to adults." In support of this proposition defendants cite to the Court the cases of *Wisconsin v. Yoder,* 406 U.S. 205, 92 S. Ct. 1526, 32 L.Ed.2d 15 (1972); *Ginsburg v. New York,* 390 U.S. 629, 88 S. Ct. 1274; 20 L.Ed.2d 195 (1968); and *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944). The cases relied on by defendants arise from a factual situation where there was a conflict between the parent and the state as to what was in the best interest of the child. In the instant case, however, we are faced with a clearly distinguishable factual situation where there is merely a potential conflict between the parent and the child as to what is in the best interest of the child. Where there is such a potential conflict between the interests of the child and other possible interests of the parent, the state cannot statutorily mandate that the parent must always prevail, for parental consent may not simply be unilaterally substituted for consent of the child; particularly, where as here, the fundamental right is infringed without affording the child any rights of due process.

Even if we were to agree with state defendants' proposition that the expression of protected rights asserted on behalf of minors may be curtailed or even prohibited, Section 3(b)(ii) of the Act still could not stand. We note that the state of Pennsylvania enacted the Act of February 13, 1970, P.L. 19, No. 10, §§ 1–5 [7] entitled "Minors' Consent to

---

6. See testimony of Michael Bradley, Erma Craven and Margaret O'Neill.

7. 35 P.S. §§ 10101–10105.

Medical, Dental and Health Services." The relevant sections of said Act are as follows:

§ 10101. Individual consent

Any minor who is eighteen years of age or older, or has graduated from high school, or has married, or has been pregnant, may give effective consent to medical, dental and health services for himself or herself, and the consent of no other person shall be necessary.

. . . . . .

§ 10103. Pregnancy, venereal disease and other reportable diseases

*Any minor may give effective consent for medical and health services to determine the presence of or to treat pregnancy,* and venereal disease and other diseases reportable under the act of April 23, 1956 (P.L. 1510), known as the "Disease Prevention and Control Law of 1955," *and the consent of no other person shall be necessary.* [Emphasis added.]

Thus, at present a pregnant minor who chooses to give birth may receive all necessary medical treatment without the consent of her parents, as a matter of Pennsylvania statutory law. Yet Section 3(b)(ii) of the Act would require a pregnant minor who chooses to abort to obtain parental consent before she could receive medical treatment to terminate the pregnancy. Such a distinction is clearly inconsistent with *Roe* and *Doe* because this section of the Act singles out the abortion procedure as it applies to minors and places an extra layer of restrictions upon the effectuation of a minor's fundamental right to choose to have an abortion.

Furthermore, the parental consent provision before us is not narrowly tailored to meet the alleged state interest in protecting the parents role in supervising their unemancipated minor children. As the Court in *State v. Koome, supra,* 530 P.2d at 265, recently observed in striking down a similar provision:

In the circumstances envisioned by this statute, there seems to be little parental control left for the State to help salvage. An unmarried minor has become pregnant, and her determination to get an abortion is unalterably opposed by her parents. Reestablishment of parental control by resort to the pure force of the criminal law seems both futile and manifestly unwise in such a situation. . . .

Finally, the asserted state interest in ensuring that the minor's decision be informed does not justify the parental consent provision of the Act. Under the terms of the Act, parental consent is mandated under every circumstance except where "necessary in order to preserve the life of the mother." Thus, a minor must obtain parental consent even if carrying to term endangers her health. The provision here in question is overbroad for it provides an absolute parental veto where less restrictive means are available to ensure that the minor's decision is a "knowing and intelligent" one [8].

Accordingly, for the reasons stated above we declare Sections 3(b)(ii) and 3(e) to be inconsistent with the Supreme Court's decisions in *Roe* and *Doe,* and therefore unconstitutional.

### VI. Protection of Life of Fetus

#### A. Viability and Potential Viability

Viability as defined in Section 2 and made operative by the Act, with criminal sanctions provided, is challenged by the plaintiffs as being uncon-

8. The physician-patient consultation that should precede any abortion provides information, advice as to alternatives, and time for deliberation. Moreover, Pennsylvania common law requires that physicians determine that a minor's decision to consent to any form of medical care is both adequately informed and considered; civil liability is available to enforce this requirement. See, e. g., *Dunham v. Wright,* 423 F.2d 940 (3d Cir. 1970) and cases cited therein.

stitutionally vague and overbroad in that as it is used in Section 5 it infringes the fundamental right of the pregnant woman to decide in consultation with her physician to have an abortion, without concern for potential fetal life, at any time prior to the 24th week of gestation. However, defendants contend that since the Act leaves the determination of viability to the physician's best medical judgment, it comports with the prevailing constitutional standards of *Roe* and *Doe* and embodies the state's important interest in protecting the life of the fetus. The challenged sections are as follows:

Section 2. Definitions. As used in this act:

.　　.　　.　　.　　.　　.

"Viable" means the capability of a fetus to live outside the mother's womb albeit with artificial aid.

.　　.　　.　　.　　.　　.

Section 5. Protection of Life of Fetus.

(a) Every person who performs or induces an abortion shall prior thereto have made a determination based on his experience, judgment or professional competence that the fetus is not viable, and if the determination is that the fetus may be viable, shall exercise that degree of professional skill, care and diligence to preserve the life and health of the fetus which such person would be required to exercise in order to preserve the life and health of any fetus intended to be born and not aborted and the abortion technique employed shall be that which would provide the best opportunity for the fetus to be aborted alive so long as a different technique would not be necessary in order to preserve the life or health of the mother.

.　　.　　.　　.　　.　　.

(d) Any person who fails to make the determination provided for in subsection (a) of this section, or who fails to exercise the degree of professional skill, care and diligence or to provide the abortion technique as pro-

vided for in subsection (a) of this section, . . ., shall be subject to such civil or criminal liability as would pertain to him had the fetus been a child who was intended to be born and not aborted.

The Act defines viability as "the capability of a fetus to live outside the mother's womb albeit with artificial aid." Plaintiffs contend there is a difference of opinion among physicians as to the period of gestation indicated by the statutory definition in question. Defendants contend that in *Roe*, the Supreme Court recognized that viability occurred when the fetus was "potentially able to live outside the mother's womb, albeit with artificial aid." *Roe, supra*, 410 U. S. at 160, 93 S.Ct. at 730. Thus defendants argue that a definition in keeping with the aforementioned pronouncement of the Supreme Court cannot be considered vague. The issue then is whether or not the Supreme Court intended to limit its holding concerning viability to the quoted language urged by defendants; for we note the Court stated in the very next sentence: "Viability is usually placed at about seven [7] months (28 weeks) but may occur earlier, even at 24 weeks." *Roe, supra*, 410 U.S. at 160, 93 S.Ct. at 730.

 Defendants also argue that there is a "common medical consensus as to the meaning of the term 'viability' and the methods uniformly used by the medical community in determining such." We note that testimony of witnesses, affidavits and depositions were offered by both parties on this issue. We believe that a preponderance of the evidence supports a finding that there is not a consensus within the medical community as to the gestational age at which viability occurs. Moreover, viability as defined in the Act, without reference to gestational age, is confusing even to members of the medical profession. The testimony of record does not indicate a consensus within the medical community as to the meaning of viability as defined by the Act; but rather

there is only a consensus as to the method for determining gestational age. Thus, the physicians who testified agreed that gestational age was determined by the physician using his best judgment in correlating the menstrual history of the particular pregnant woman with his findings from a physical examination of the pregnant woman. It is clear from the evidence that while not every physician would reach exactly the same determination as to gestational age, there would be a consensus within reasonable and tolerable limits.

The ability of a fetus to live outside the mother's womb cannot be determined directly. To reach such a judgment physicians must correlate certain probability of survival factors with the gestational age to determine viability as defined by the Act. The evidence clearly demonstrates that the statistical data available to the physician concerning fetus survival is not precise; also other variables such as the mother's health and the quality of hospital facilities in the community must be taken into consideration. There is a lack of consensus within the medical community as to "the capability of a fetus to live outside the mother's womb albeit with artificial aid" when the gestational age of the fetus is determined to be between 20 and 28 weeks. The closer gestational age is to 20 weeks, the greater is the probability that the fetus cannot live outside the mother's womb; the closer gestational age is to 28 weeks, the greater is the probability that the fetus can live outside the mother's womb. The inability of

physicians to agree in this area is demonstrated by the fact that Dr. Franklin, a plaintiff, believed that the statistical probabilities dictated a finding that viability would only occur at approximately 28 weeks, based upon a 10 percent probability of survival rate for fetuses of 28 weeks gestation. Dr. Gerstley, who also appeared on behalf of plaintiffs, did not completely agree with Dr. Franklin's analysis and set 24 weeks as the minimum period necessary for viability. Similarly, physicians presented on behalf of defendants did not agree among themselves nor with the plaintiffs' physicians. Thus Dr. Keenan placed viability at 26 weeks, based upon a 10 to 30 percent probability of survival rate for fetuses of 26 weeks gestation. A fair reading of the testimony of another physician called by the defendants, Dr. Mecklenburg, demonstrates that he would reach the conclusion that viability occurred at 20 weeks gestation[9].

Defendants argue at page 38 of their post-trial brief that viability can only be said to exist with absolute certainty at 26 to 28 weeks gestation and the Abortion Control Act does not prohibit an abortion prior thereto. Of course, this is counsel's interpretation of the statute and not the language of the statute. Indeed, if the statute had even limited viability to 24 weeks gestation, it would be in conformity with the pronouncement of *Roe*, and not subject to a successful challenge. Nevertheless, we must decide the issue before us on the basis of the statute as written, rather than as interpreted by counsel.

9. The specific testimony of Dr. Mecklenburg concerning this issue was as follows:
 Mr. Morris: Doctor, as one who performs abortions I want to read you a sentence and ask you what it means to you. The sentence is, "Viability means capability of a fetus to live outside the woman's womb albeit with artificial aid" . . . . .
 Dr. Mecklenburg: I would agree with that definition of viability. I think that it has been current. I think it is a definition that takes into account medical progress, the fact that it is constantly changing. My perusal of the medical literature would

lead me to believe that potential or continued life exists as early as 20 weeks—not in the current edition of Eastman's Obstetrics Book, but in the previous edition, the earliest report a survivor was reported as a delivery at 20 weeks gestation. In my own experience I have—the earliest survival that I have had is a patient who was 21 weeks from the time of conception or 23 weeks from the first day of her last menstrual period. The child is a year and a half old and normal.
 (Tr. 1/14/75, pp. 82–3.)

In considering the facial validity of the challenged definition of viability of the Abortion Control Act, and Section 5 as it incorporates the definition, we are guided by the analysis of Mr. Justice Marshall found in *Grayned v. City of Rockford*, 408 U.S. 104, at 108–9, 92 S.Ct. 2294, at 2298–9, 33 L.Ed.2d 222 (1972):

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of [those] freedoms." Uncertain meanings inevitably lead citizens to " 'steer far wider of the lawful zone' . . . than if the boundaries of the forbidden areas were clearly marked." [Footnotes omitted.]

We find that the Abortion Control Act's definition of viable is vague because it does not notify physicians as to what conduct on their part is prohibited. We have carefully considered the arguments of defendants and particularly the contention that while the legislature could have defined the standard for prohibited conduct in terms of gestational age, it was entitled to define it as set forth in the Act, especially where the definition in the Act will continue to be valid even when advances in the medical profession lower the gestational age for viability. Of course, the very flexibility argued for by defendants contributes to the vagueness of the Act. Moreover, the Act may reasonably be interpreted in the medical community as setting viability at a substantially lower gestational age than the 26 to 28 weeks which defendants' counsel contends it presently sets.

 Plaintiffs also argue that the vagueness of the definition of viability subjects them to possible arbitrary and discriminatory prosecution. The evil is one recognized by Justice Marshall in *Grayned v. City of Rockford, supra*, where he states at 408 U.S. 108–9, 92 S.Ct. 2299: "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." We believe that such a danger exists here for, without an objective standard to guide law enforcement officers, prosecutors and courts, physicians will be subject to prosecution controlled only by the subjective determinations of those charged with law enforcement. The possibility of such arbitrary enforcement certainly will, as plaintiffs contend, inhibit and deter physicians from performing abortions after a fetus has reached the gestational age of 20 weeks. Such a limitation prior to the 24th week of gestation is inconsistent with the fundamental right of a pregnant woman to obtain an abortion without regard to the potential for fetal life within the second trimester of the pregnancy. We find that the Supreme Court in *Roe* intended to set the lowest limit at which viability may be deemed to occur at the 24 week period. Accordingly, we hold that Section 2's definition of viability, Section 5(a) of the Act, which incorporates that definition, and Section 5(d), which imposes civil and criminal sanctions, are inconsistent with *Roe*, and are therefore unconstitutional.

 In addition to challenging the definition of viability as being vague,

plaintiffs also challenge the right of the legislature to regulate the procedure used where the fetus "may be viable", as evidenced by the language of Section 5(a) and enforced by Section 5(d) of the Act. *Roe* makes it abundantly clear that the compelling point at which a state in the interest of fetal life may regulate, or even prohibit, abortion is not before the 24th week of gestation of the fetus, at which point the Supreme Court recognized the fetus then presumably has the capability of meaningful life outside the mother's womb. Consequently, *Roe* recognizes only two periods concerning fetuses. The period prior to viability, when the state may not regulate in the interest of fetal life, and the period after viability, when it may prohibit altogether or regulate as it sees fit. The "may be viable" provision of Section 5(a) tends to carve out a third period of time of potential viability. Defendants' witness, Dr. Keenan, testified that based upon his interpretation of Act 209, the Act's definition of potential viability occurs at 20 to 26 weeks gestation. (See Tr. 1/17/75, p. 549.) It is clear that in carving out this new time period labeled "may be viable" the state is regulating abortions during the second trimester, when it may lawfully do so only in the interest of maternal health. Yet the state does not claim the provision to be in the interest of maternal health, nor has it shown any connection between this provision concerning fetuses which "may be viable" and maternal health. Clearly, the state seeks to justify this provision only as a measure in furtherance of its claimed interest in protecting potentially viable fetuses. Since this provision does not meet the requirements of *Roe*, we declare it to be unconstitutional.

In reaching our conclusion concerning the issue of viability as defined, and as incorporated in Section 5(a), we have considered two cases which defendants have cited as upholding similar definitions of viability: *Wolfe v. Schroering*, 388 F.Supp. 631 (W.D.Ky.1974) and *Planned Parenthood of Central Missouri v. Danforth*, 392 F.Supp. 1363 (E.D.Mo. 1974), *stay grtd.*, 420 U.S. 918, 95 S.Ct. 1111, 43 L.Ed.2d 389 (1974). After examining *Wolfe* and *Danforth* we are not persuaded by the reasoning of the three-judge courts in either case, but rather we are bound to follow the mandate of the United States Supreme Court in *Roe* and *Doe*. Our decision herein is consistent with the holdings of several other courts. See, for example, *Hodgson v. Anderson*, 378 F.Supp. 108 (D.Minn.1974), *appeal dismissed*, 420 U.S. 903, 95 S.Ct. 819, 42 L.Ed.2d 832 (1975); and *Leigh v. Olson*, 385 F.Supp. 255 (D.N.D.1974).

### B. Disposition of Dead Fetuses

Plaintiffs attack Section 5(c) of the Act which requires the Department of Health to make regulations to provide for the humane disposition of dead fetuses. Plaintiffs contend that this provision is an overbroad unconstitutional invasion of the pregnant woman's right of privacy with respect to pregnancies terminated during the first and second trimesters, wherein the only compelling state interest relates to maternal health in the second trimester. Defendants respond to plaintiffs' attack with the argument that "the section in question in no way burdens the exercise of a constitutional right but instead expresses a clear state interest in public health and welfare." The challenged provision is as follows:

Section 5. Protection of Life of Fetus.

. . . . . .

(c) The department shall make regulations to provide for the humane disposition of dead fetuses.

. . . . . .

Plaintiffs' challenge to this section is based on a fear that future adopted regulations will require elaborate funeral provisions, treating the fetus as a human, and that psychologically and financially such regulations will burden a pregnant woman's decision concerning abortion. At the time of trial, plaintiffs made it clear that they did not question the right of the Department of Health to make regulations concerning the disposition of

live tissue. The following statement by counsel for the plaintiffs sets forth plaintiffs position in this regard:

As far as the department's ability to make regulations as to disposition of live tissue generally, or for that matter with respect to disposition of fetal tissue for purposes of laboratory studies and such, that's no problem, but that power already exists more than amply under the general powers of the Department of Health, which are extremely broad.

So we are not, and there is no issue here of preserving a power which the Department of Health would not otherwise possess. (Tr. 1/15/75, p. 166.)

In addition the state, in its post-trial brief notes that the plaintiffs do not object

to incineration of dead fetuses. Certainly, no argument is made regarding fears expressed by plaintiffs on burial requirements. The Commonwealth would submit that the reasonable intent of the Act is to preclude the mindless dumping of aborted fetuses on to garbage piles. . . . . [Thus,] the obvious public health considerations regarding sanitation, disease prevention and surgical standards more than amply justify the requirement of Section 5(a).

We view the particular provision in question as being merely an enabling statute which is not unconstitutional on its face. We believe that the state in the constitutional exercise of its police power may provide for the disposition of dead fetuses to protect the public health. The language of the statute which troubles plaintiffs is that it requires the *humane* disposition of dead fetuses. Of course, a regulation that requires expensive burial may very well invade the privacy of the pregnant woman and burden her decision concerning an abortion. However, no such regulation has been adopted to date pursuant to Section 5(c), and we find that this section is

not unconstitutional on its face. We, of course, do not foreclose a future challenge to any unconstitutional regulation adopted pursuant to this section.

### VII. Control of Practice of Abortion

#### A. Pregnancy Determination

Section 6 of the Act is concerned with the control of the practice of abortion. Plaintiffs challenge Section 6(a), which is criminally enforced by Section 6(i), to the extent that it requires a positive determination of pregnancy prior to the performing of an abortion. Defendants respond by arguing that the positive pregnancy determination requirement manifests a compelling state interest in maternal health. The challenged provision is as follows:

Section 6. Control of Practice of Abortion.

(a) Every person who intends to perform or induce an abortion shall first have made a determination of the pregnancy of the person to be aborted.

. . . . . .

At page 52 of their post-trial brief, the plaintiffs concede " . . . physicians agree that it is desirable to have positive pregnancy indications prior to undertaking an abortion procedure on the grounds that, generally, individuals should not be subjected to medical procedures without a clear indication of the requirement therefore, . . . " However, notwithstanding this concession, plaintiffs argue that "under certain circumstances the procedure known as menstrual extraction can be, and desirably is, performed prior to the time when [an] average facility can determine with absolute certainty whether or not the patient is pregnant." Thus, plaintiffs only factual reason for challenging this section is that occasionally a patient may seek an abortion by menstrual extraction within the first few days of pregnancy, and at that time a reliable test for de-

termining pregnancy is not available outside of Philadelphia County [10].

There appears to be substantial agreement between the parties that a menstrual extraction is an abortion procedure and that there are possible risks to the health of the female patient from infection and hemorrhage. An additional relevant factor in our determination in this area is the response of plaintiffs' witness, Dr. Matthews, to questions put to him by defense counsel on cross-examination:

> Mr. Mansmann: Now, you had testified about a menstrual extraction, and you performed them at your clinic; is that right?
>
> Dr. Matthews: Yes.
>
> Mr. Mansmann: Is it your medical opinion that it would be better for a woman to see whether or not she is pregnant before she undergoes a menstrual extraction, or does it make any difference?
>
> Dr. Matthews: I am not overjoyed with menstrual extraction as a procedure. Because if you do them within one week of the last missed period, probably only about 50 to 55 percent of them will be pregnant. (Tr. 1/14/75, p. 126.)

In sum, it is plaintiffs' contention that even though a prior determination of pregnancy is desirable before an abortion procedure is performed, Section 5 (a) of the Act is unconstitutional because it is not limited to the period following the first trimester of pregnancy, when the state may lawfully regulate abortions in the interest of maternal health. However, plaintiffs do concede that preventing nonpregnant women from undergoing abortion procedures is in the interest of female health.

■ We believe *Roe* mandates that once a pregnancy has been determined to exist, the state may not regulate in the interest of maternal health during the first trimester of pregnancy. Nevertheless, we do not believe that *Roe* precludes the state from requiring a positive determination of pregnancy prior to the performance of an abortion procedure in furtherance of its interest in protecting nonpregnant females from undergoing unneeded abortion procedures. We do not believe that the Supreme Court intended by its *Roe* protection of pregnant females to preclude the statutory protection of nonpregnant females in the manner here challenged. Accordingly, we hold that Section 6(a) is constitutional.

### B. Performance of Abortion Subsequent to Viability

Plaintiffs challenge Section 6(b) of the Act, which is criminally enforced by 6(i), to the extent that it incorporates the definition of viability found in Section 2 of the Abortion Control Act. Defendants respond by arguing that the definition of viability is in accord with *Roe*, and embodies the state's interest in protecting the potential life of the fetus. The challenged provision is as follows:

> Section 6. Control of Practice of Abortion.
>
> · · · · · ·
>
> (b) No abortion shall be performed within the Commonwealth of Pennsylvania during the stage of pregnancy subsequent to viability of the fetus except where necessary, in the judgment of a licensed physician, to preserve the life or health of the mother.
>
> · · · · · ·

■ Plaintiffs acknowledge the right of the state to prohibit abortions subsequent to viability but attack the definition of viability for the reasons hereinbefore set forth in our analysis of

---

10. Plaintiffs agree with defendants that Planned Parenthood, in a program in cooperation with Jefferson Hospital of Philadelphia, can obtain a positive testing within the first few days of pregnancy by a radio immuno assay. Also, apparently there is no question that residents of surrounding counties in the Eastern District of Pennsylvania could also receive such testing through the facilities of Planned Parenthood or Jefferson Hospital.

Section 2 and Section 5 of the Act. We have hereinbefore determined that the Act's definition of viability is unconstitutionally vague; accordingly, Section 6(b), which incorporates that infirm definition, is declared to be unconstitutional.

### C. Abortion Facility Approval

Plaintiffs challenge Section 6(c), which is criminally enforced by Section 6(i), to the extent that it requires an abortion to be performed in a facility approved by the Department of Health. Citing as authority the cases of *Nyberg v. City of Virginia*, 495 F.2d 1342, at 1345 (8 Cir. 1974); *Word v. Poelker*, 495 F.2d 1349 (8 Cir. 1970); and *Hodgson v. Anderson*, 378 F.Supp. 1008, at 1016 (D.Minn. June 27, 1974), plaintiffs contend that this provision is unconstitutional because no regulation of abortion may take place in the first trimester and the statute fails to take cognizance of the separate trimesters of pregnancy. Defendant Fitzpatrick concedes that Section 6(c) is unconstitutional insofar as it requires facility approval with respect to first trimester abortions. However, the state defendants contend that the provision in question is constitutional because state regulation in this area is related to the state's legitimate interests in protecting maternal health and would not intrude on the abortion decision. The challenged provision is as follows:

Section 6. Control of Practice of Abortion.

. . . . . .

(c) No abortion shall be performed within the Commonwealth of Pennsylvania except by a licensed physician and in a facility approved to do so by the Department of Health in accordance with its rules and regulations.

.. . . . . .

We note that the Department of Health has not presently adopted any regulations pursuant to this provision of the Act. It is admitted by plaintiffs that the Pennsylvania Department of Health, after public hearings, issued regulations governing free standing abortion clinics prior to the enactment of the Act. It is further admitted that hospitals are facilities approved by the Department of Health and that the regulations adopted prior to the enactment of the Act do not intrude upon the decision of whether or not to abort, or the decision of how to abort. Finally, it is admitted that the present Health Department's regulations do not constitute an invasion into the physician-patient relationship and that these regulations do not intrude upon the woman's right of privacy. (See Tr. 1/17/75, pp. 521–522). Thus, the question concerning the constitutionality of Section 6(c) is tendered to us with a clear record of regulation in the area by the Department of Health pursuant to its general powers. It is undisputed that no regulations have as yet been promulgated pursuant to Section 6(c) of the Act.

Plaintiffs succinctly state their position with respect to this provision in their post-trial brief at page 56 as follows:

Plaintiffs do not challenge reasonable regulations of abortion promulgated under the general powers of the Department of Health, and we do not believe that the validity of the abortion regulations promulgated prior to the enactment of this statute is at issue here. However, we contend that the provisions of the present Act with regard to regulation of abortion should be struck down. To the extent that they reflect the legislative attempt to "control" abortion they are unconstitutional. To the extent that they merely purport to enable the Department to promulgate reasonable regulations to protect maternal health, they are not supported by any legitimate state purpose, since they are redundant of the Department's general powers.

 From the record in this case and the statements of counsel in their post-trial brief, it is indeed open to question whether or not there is a real challenge by plaintiffs to this particular pro-

vision of the Act, and, accordingly whether there is a justiciable controversy presently before the Court in this regard. However, we consider plaintiffs' challenge to be that an act which authorizes the future adoption of regulations in this area is unconstitutional on its face, if it does not also provide that the regulations only apply to abortions performed after the first trimester. We do not believe that the provision in question is unconstitutional on its face, nor do we believe that it is inconsistent with either *Roe* or *Doe* in merely authorizing regulations. Of course, any regulations promulgated in the future must be consistent with the requirements of the Supreme Court[11]. Accordingly, we declare Section 6(c) not to be unconstitutional on its face and deny plaintiffs' request for injunctive relief.

### D. Information to be Reported Concerning Abortions

Plaintiffs challenge Section 6(d) of the Act, which is criminally enforced by Section 6(i), to the extent that it requires information relating to whether the abortion was necessary to preserve the mother's life or health, and the spousal and parental consent provisions hereinbefore declared to be unconstitutional. These consent provisions are found in Section 3 of the Act. Defendant Fitzpatrick concedes that the spousal and parental consent provisions of the Act are unconstitutional; however, the state defendants contend that both the spousal and parental consent provisions and Section 6(d) of the Act are constitutional. The challenged provision is as follows:

Section 6. Control of Practice of Abortion.

. . . . . .

(d) Every facility in which an abortion is performed pursuant to this act within the Commonwealth of Pennsylvania shall currently make and keep on file upon forms prescribed by the Department of Health a verified statement signed by the person who performed the abortion setting forth the following information with respect to such abortion: . . . the name and address, if known, of the spouse of the woman; the name and address, if known, of the parent or person in loco parentis if the woman is under eighteen years of age and unmarried; the approximate age, in months of the fetus; a full statement of those facts upon which the person performing the abortion relied as establishing that the abortion was necessary to preserve the life or health of the mother. Affixed to such statement shall be a copy of each of the documents showing consent to abortion as required by section 3 of this act.

. . .

■ Section 6(d) of the Act mandates the reporting of information which is directly related to Section 3(b)(i), 3(b)(ii), and 6(b). However, we have declared the requirements of spousal consent found in Section 3(b)(i) and parental consent found in Section 3(b)(ii), and the performance of abortion requirements found in Section 6(b), to be unconstitutional. Accordingly, we declare unconstitutional the reporting requirements of Section 6(d) that seek information as to:

[T]he name and address, if known, of the spouse of the woman; the name and address, if known, of the parent or person in loco parentis if the woman is under eighteen years of age and unmarried; . . . ; a full statement of those facts upon which the person performing the abortion relied as establishing that the abortion was necessary to preserve the life or health of the mother.

### E. Prohibition Against Abortion Advertising

Plaintiffs challenge Section 6(f) of the Act, which is criminally enforced by

11. For a more recent, post-*Roe* decision in this area, see *Friendship Medical Center, Ltd. v. Chicago Board of Health*, 505 F.2d 1141 (7th Cir. 1974), cert. den., 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975).

Section 6(i), to the extent it deprives physicians of their rights to free speech, due process of law, and equal protection of the law. Defendants urge that the Act's "ban on abortion advertising narrowly prohibits commercial solicitation in the medical health field in accord with prevailing constitutional authority." The challenged provision is as follows:

Section 6. Control of Practice of Abortion.

. . . . . .

(f) No physician, clinic or other person or agency shall engage in solicitation or advertising having the purpose of inviting, inducing or attracting members of the public to come to such physician, clinic or other person or agency to have abortions or to purchase abortifacients.

. . . . . .

Plaintiffs in their post-trial brief at page 54 contend, and we find, "the evidence in this case indicates that a class-plaintiff, Dr. Marshall Klavan, has subscribed to and desire[s] to publish yellow page advertising and to provide information to referral service agencies with the purpose of inducing members of the public to utilize the services of his clinic . . . "

Defendant Fitzpatrick argues that the plaintiffs "cannot complain of a statute which merely enacts the self-imposed limitation of the medical community." Nevertheless, defendant Fitzpatrick "would agree that yellow page listings would not constitute reprehensible advertisement so long as those listings comported substantively with the above mentioned standards." Thus, the position of defendant Fitzpatrick is that a yellow page listing, such as plaintiffs seek, does not violate the medical community's Canons of Ethics.

The state defendants, on the other hand, defend the solicitation or advertising ban of the Act even as to the dissemination of the information proposed by Dr. Klavan. Moreover, the state defendants deny that plaintiffs have standing to raise the First Amendment issue

presently before us; and alternatively, argue that even if plaintiffs have standing, the relief requested, should be denied because "a clear line of constitutional authority exists in the First Amendment area recognizing the power of the government to regulate commercial advertising."

▇ Subsequent to final hearing in this matter, the United States Supreme Court decided the case of *Bigelow v. Commonwealth of Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). Under the test set forth in *Bigelow*, it is clear that plaintiffs have asserted a legitimate First Amendment interest and have standing to challenge Section 6(f) of the Act as being facially overbroad. The Supreme Court stated in *Bigelow, supra,* 421 U.S. at 816, 95 S.Ct. at 2230: "We give a defendant standing to challenge a statute on grounds that it is facially overbroad, regardless of whether his own conduct could be regulated by a more narrowly drawn statute, because of the 'danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application'. *NAACP v. Button,* 371 U.S. [415], at 433 [83 S.Ct. 328, 9 L.Ed.2d 405]."

In *Bigelow*, Mr. Justice Blackmun in his opinion for the Court said: "The Court has stated that 'a State cannot foreclose the exercise of constitutional rights by mere labels'. *NAACP v. Button,* 371 U.S., at 429 [83 S.Ct. 328, 9 L. Ed.2d 405]. Regardless of the particular label asserted by the State—whether it calls speech 'commercial' or 'commercial advertising' or 'solicitation'—a court may not escape the task of assessing the First Amendment interest at stake and weighing it against the public interest allegedly served by the regulation. . . . "

▇ Thus, contrary to the state defendants' contention, merely applying a label "commercial solicitation" does not justify narrowing the protection of expression secured by the First Amend-

ment; particularly where the activity advertised is not illegal, nor in violation of professional ethics, and, where as here, the activity advertised pertains to the constitutionally protected interests of pregnant women who may desire the information in the exercise of their fundamental right to decide to have an abortion.

In support of Section 6(f), the state defendants contend that the provision in question furthers the state's interest in protecting maternal health. Yet the state has failed to prove in any rational manner how the statutory prohibition of the proffered information would promote its asserted interest in maternal health. Clearly the First Amendment interests at stake here outweigh the asserted interests of the state; accordingly, we declare Section 6(f) to be unconstitutional.

### F. Criminal Sanctions

Plaintiffs challenge Section 6 (i) of the Act to the extent it subjects physicians and others to criminal penalties for the violation of Sections 6(a) to 6(f). The challenged section is as follows:

Section 6. Control of Practice Abortion.

. . . . . .

(i) Any person or agency who violates any of the provisions of subsection (a), (b), (c) or (g) of this section is guilty of a misdemeanor of the first degree and any person or agency who violates any of the provisions of subsection (d), (e) or (f) of this section is guilty of a misdemeanor of the third degree.

In conformity with this Court's above determination that Sections 6(b), 6(d) in part, and 6(f), are unconstitutional we declare that Section 6(i) of Act 209 is unconstitutional to the extent that it ascribes criminal penalties for the violation of Section 6(b), or the infirm portion of Section 6(d), and 6(f).

### VIII. Subsidizing of Abortions

Section 7 of the Abortion Control Act is concerned with the subsidizing of abortions. Plaintiffs attack this section on the grounds that it: 1) "imposes an unconstitutional limitation upon the right of medically indigent women to determine with their physician to terminate a pregnancy during the first two trimesters, 2) classifies women on the basis of wealth with regard to the medical standards for abortion, and 3) discriminates against [the] medically indigent who choose abortion by failing to pay for their medical treatment while paying the full cost of the medical treatment of women who choose childbirth," allegedly in violation of Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq., and the Equal Protection Clause of the Fourteenth Amendment. Defendant Fitzpatrick concedes the unconstitutionality of this section. However, the state defendants contend this provision is constitutional because: 1) the fundamental right to decide to terminate a pregnancy by abortion does not include a fundamental right that requires the state to pay for the abortion, and 2) in an effort to conserve limited state resources, the state has a legitimate interest in paying only for the more "important and medically necessary services." The challenged section is as follows:

Section 7. Subsidizing of Abortions.

Since it is the public policy of the Commonwealth not to use public funds to pay for unneeded and unnecessary abortions, no abortion shall be subsidized by any State or local governmental agency in the absence of a certificate of a physician, filed with such body, stating that such abortion is necessary in order to preserve the life or health of the mother.

Nothing contained in this section shall be interpreted to restrict or limit in any way, appropriations, made by the Commonwealth or a local governmental agency to hospitals for their maintenance and operations, or, for

reimbursement to hospitals for services performed.

With respect to plaintiffs' challenge concerning an alleged discrimination against the indigent pregnant female who chooses abortion, we note that the plaintiffs make two basic attacks on Section 7: 1) the provision is inconsistent with the Social Security Act, and therefore invalid under the Supremacy Clause, and 2) the provision violates the Equal Protection Clause by creating an unlawful distinction between indigent women who choose to carry their pregnancies to birth and indigent women who choose to terminate their pregnancies by abortion. This Court being mindful of the Supreme Court's preference for statutory resolution of cases, as opposed to constitutional resolution of cases, will first consider the challenged provision on the basis of Title XIX of the Social Security Act. See *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).

State defendants admit that it is the policy of the state of Pennsylvania, with respect to its Title XIX program, to pay the full costs of term delivery for eligible women. It is also the policy of the state, as evidenced by Section 7 of the Act, not to pay any of the costs of an abortion for eligible women, unless the abortion is necessary in order to preserve the life or health of the mother.

 One of the questions before us is whether Pennsylvania's policy governing payment for the costs of abortions is compatible with Title XIX? Subsequent to the trial in this matter, the U.S. Court of Appeals for the Third Circuit decided the case of *Doe v. Beal,* 523 F.2d 611 (3d Cir. 1975) (en banc). In *Doe v. Beal supra,* the Third Circuit held that a non-statutory state policy prohibiting payment for non-therapeutic abortions [12] is in conflict with Title XIX of the Social Security Act. Accordingly, we apply the law of the Circuit and enjoin the enforcement of Section 7 of the Act insofar as it restricts the payment of Title XIX funds for the costs of an abortion.

However, Section 7 of the Act does not confine itself to Title XIX funds, but rather it applies to any subsidy from a state or local governmental agency. Therefore, our above resolution of the statutory challenge to Section 7 does not completely dispose of the matter, and we must now determine plaintiffs' constitutional challenge to the section.

Plaintiffs contend that since pregnant women have only the option of either birth or abortion, a distinction between indigent pregnant women who choose to carry their pregnancies to birth and indigent pregnant women who choose to terminate their pregnancies by abortion, deprive women who choose abortion of their rights guaranteed by *Roe* and the Equal Protection Clause of the Fourteenth Amendment.

The state admits that it provides medical payments for indigent women who carry to term, but not for indigent women who choose to terminate their pregnancy by abortion. Under the Act, an indigent pregnant woman, who is refused medical assistance for a first trimester abortion, may proceed to give birth and

---

**12.** As discussed in *Doe v. Beal,* supra, the state's policy under its Medical Assistance program prior to the enactment of the Abortion Control Act was that abortions would only be paid for in the following situations:

1. There is documented medical evidence that continuance of the pregnancy may threaten the health or life of the mother;

2. There is documented medical evidence that the infant may be born with incapacitating physical deformity or mental deficiency; or

3. There is documented medical evidence that a continuance of a pregnancy resulting from legally established statutory or forcible rape or incest, may constitute a threat to the mental or physical health of a patient;

4. Two other physicians chosen because of their recognized professional competency have examined the patient and have concurred in writing; and

5. The procedure is performed in a hospital accredited by the Joint Commission on Accreditation of Hospitals.

the state will pay the reasonable medical expenses incident to the birth. We observe that in this situation the state pays a greater sum of money and clearly does not "conserve limited state resources."

Thus, without realizing any fiscal savings for the state, the Act coerces some pregnant women into a decision to give birth. Of course, we realize that not all pregnant women will forfeit their right to obtain an abortion and some may in fact obtain the abortion without the use of state funds. We note that the state has not attempted to justify Section 7 by arguing that it is less expensive for a pregnant woman to carry to term than for her to have an abortion, and the evidence of record suggests the contrary. Another three-judge court in this Circuit has also concluded that childbirth is costlier than abortion. *Doe v. Wohlgemuth*, 376 F.Supp. 173, at 187 (W.D.Pa. 1973), *aff'd on other grounds, Doe v. Beal, supra.*

 The principal state contention is that "the existence of a fundamental right to decide to have an abortion is not sufficient to order that the means to implement the decision be provided by the State." Thus the argument of Pennsylvania is that the Constitution does not require the state to finance the exercise of a fundamental right. We agree with this general proposition of law, but it does not resolve the issue before us. The issue is whether Pennsylvania may make the exercise of a fundamental right, i. e. a decision to have an abortion, the operative factor in cutting off medical benefits to indigent pregnant women, while continuing benefits to those who decide to give birth. We hold that Section 7 of the Act which penalizes the decision to have an abortion is unconstitutional.

 As a threshold matter, we determine that the appropriate standard by which Section 7 is to be measured is the compelling state interest test and not the rational relationship test. The determination by the Supreme Court in

*Roe* that it is only when the state interest reaches certain compelling points that the state may regulate with respect to maternal health and fetal life clearly suggests that any state regulation, which burdens the right of the pregnant woman to decide whether to give birth or to terminate a pregnancy, must be necessary to promote a compelling governmental interest. Indeed, the Supreme Court has determined in both pre-*Roe* and post-*Roe* decisions that the compelling state interest test must be applied when fundamental rights are infringed. *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) and *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974).

In *Shapiro,* the Supreme Court found unconstitutional state statutes denying welfare assistance to residents who had not resided within the jurisdiction for at least one year immediately preceding their applications for public assistance. The Court in deciding that the compelling interest test applied stated at 394 U.S. 634, 89 S.Ct. 1331:

> At the outset, we reject appellants' argument that a mere showing of a rational relationship between the waiting period and the . . . permissible state objectives will suffice to justify the classification . . . The waiting-period provision denies welfare benefits to otherwise eligible applicants solely because they have recently moved into the jurisdiction. But in moving from State to State or to the District of Columbia appellees were exercising a constitutional right, and any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a compelling governmental interest, is unconstitutional.

In the post-*Roe* decision, of *Memorial Hospital v. Maricopa County, supra,* the Supreme Court has recently reaffirmed the principle of *Shapiro.* In *Maricopa County* a durational county residence requirement for eligibility for non-emer-

gency free medical care for indigents was measured by the compelling state interest test and was held to be unconstitutional.

Here, as in *Shapiro* and *Maricopa County,* we deal with governmental benefits for indigents. Here, we deal with a particular subclass of indigents, those who are pregnant. Here as in *Shapiro* and *Maricopa County,* those indigent pregnant women who exercise a right protected by the Constitution, i. e. to have an abortion, are denied the governmental benefit solely as a consequence of the exercise of that right. Accordingly, in reliance on *Roe, Shapiro,* and *Maricopa County,* we hold that although an indigent pregnant woman may not have a fundamental right to require the government to subsidize an abortion, where the state so classifies as to deprive particular indigents of the benefits otherwise available, as a consequence of their exercise of a fundamental right, the state legislation must be measured by the compelling state interest test and the state must demonstrate that its classification scheme promotes a legitimate governmental objective.

The only objective asserted by the state is that its scheme of medical reimbursement is designed to pay only for the more "important and medically necessary services," in an effort to conserve limited state resources. The state does not contend that the costs associated with an abortion are greater than the costs associated with birth, rather the state argues that birth is somehow more medically necessary than abortion. In todays society all pregnant women need medical treatment regardless of whether the woman's decision is to give birth or to terminate the pregnancy. There is no physiological or psychological basis in the case of a pregnancy to label the medical services attendant to birth more important or necessary than those attendant to abortion. The language of the statute indicates that the distinction here contended for by Pennsylvania rests upon a social policy preference and not

a medical determination. Of course, a statute which discriminates in terms of illegal classifications and penalizes the exercise of a constitutional right is unconstitutional even though it reflects the social value judgment of the legislature. As the Supreme Court observed in *Shapiro, supra* 394 U.S. at 631, 89 S.Ct. 1329:

> Thus, the purpose of deterring the in-migration of indigents cannot serve as justification for the classification created by the one-year waiting period, since that purpose is constitutionally impermissible. If a law has "no other purpose . . . than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it [is] patently unconstitutional." [Citation omitted.]

Perhaps the state may constitutionally choose not to pay for any medical services related to the condition of pregnancy. However, once the state decides to provide medical payments for those who choose one alternative medical treatment for pregnancy, i. e. childbirth; it cannot penalize those whо choose the other constitutionally protected alternative medical treatment, i. e. abortion, because of an alleged fiscal interest. As Mr. Justice Brennan observed in his opinion for the Court in *Shapiro, supra,* 394 U.S. at 633, 89 S.Ct. at 1330:

> We recognize that a state has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program. But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens. It could not, for example, reduce expenditures for education by barring indigent children from its schools. Similarly, in the cases before us, appellants must do more than show that denying welfare benefits to new residents saves money. The saving of welfare costs cannot justify an otherwise invidious classification.

All post-*Roe* case authority supports the proposition that statutes or administrative policies which restrict reimbursement for abortions are unconstitutional. *Doe v. Wohlgemuth, supra, aff'd on other grds., Doe v. Beal, supra; Doe v. Rose,* 499 F.2d 1112 (10th Cir. 1974); *Wulff v. Singleton,* 508 F.2d 1211 (8th Cir. 1975); and *Doe v. Rampton,* 366 F. Supp. 189 (D.C.Utah 1973).

For the reasons stated above, we find that Section 7 of the Abortion Control Act is in conflict with Title XIX of the Social Security Act. As to non-Title XIX funds, Section 7 violates the Equal Protection Clause of the Fourteenth Amendment and is inconsistent with the Supreme Court's decision in *Roe;* accordingly, we hold that Section 7 is unconstitutional.

### IX. Regulations

Section 8 of the Act gives the Department of Health the authority to make rules and regulations with respect to the performance of abortions and the facilities in which abortions are performed. Plaintiffs contend that this provision intrudes upon the pregnant woman's fundamental right of privacy. The challenged section is as follows:

Section 8. Regulations.

The Department of Health shall have power to make rules and regulations pursuant to this act, with respect to performance of abortions and with respect to facilities in which abortions are performed, so as to protect the health and safety of women having abortions and of premature infants aborted alive. Said rules and regulations shall include, but not be limited to procedures, staff, equipment, and laboratory testing requirements for all facilities offering abortion services.

■ Plaintiffs' assault on Section 8 is premature. This provision of Act 209 is merely an enabling provision granting the Department of Health the authority to make rules and regulations in the abortion area. At the present time, no regulations are before us which have been enacted by the Department of Health; thus, there are no regulations we can scrutinize to determine whether or not a constitutional deprivation has occurred. On the basis of the record before us, we will not assume that the regulations, if any, which may be enacted pursuant to the Act will be inconsistent with the Supreme Court's decisions in *Roe* and *Doe* [13]. Consequently, we find Section 8 not to be unconstitutional on its face.

### X. The Choice of Appropriate Relief

In our consideration of the Abortion Control Act, we have severed provisions of the Act which we find to be unconstitutional and have denied plaintiff's request that we declare the whole Act unconstitutional as representing a legislative intent to control in an impermissible manner the fundamental right of a pregnant woman in consultation with her physician to decide to have an abortion. It is clear to this Court that the sections declared unconstitutional or inconsistent with a federal statute, if enforced against plaintiffs and the class they represent, would cause irreparable injury to plaintiffs. We recognize that this Court should enter only a declaratory judgment, and not the injunctive relief requested, if we are satisified that defendants will acquiesce in the decision holding the challenged provisions of the Act unconstitutional. *Poe v. Gerstein,* 417 U.S. 281, 94 S.Ct. 2247, 41 L.Ed.2d 70 (1974); *Douglas v. Jeannette,* 319 U.S. 157, at 165, 63 S.Ct. 877, at 881, 87 L.Ed. 1324 (1943); *Dombrowski v. Pfister,* 380 U.S. 479, at 484–485, 85 S.Ct. 1116, at 1119–20, 14 L.Ed.2d 22 (1965); *Zwickler v. Koota,* 389 U.S. 241, at 253–254, 88 S.Ct. 391, at 398, 19 L.Ed. 2d 444 (1967); *Roe v. Wade, supra,* 410

---

13. E. g., in Roe, see discussion at 410 U.S. 163, 93 S.Ct. 732. And, see *Friendship Medical Center, Ltd. v. Chicago Board of* *Health,* 505 F.2d 1141 (7th Cir. 1974), cert. den., 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975).

U.S. at 166–67, 93 S.Ct. at 733, 35 L.Ed. 2d 147 (1973).

In the instant case, counsel for defendant Fitzpatrick has stated in open court that defendant Fitzpatrick will abide by any declaratory judgment entered by this Court. With respect to the state defendants, we have a more difficult problem. We are aware of the fact that the Abortion Control Act was enacted by the Pennsylvania legislature over the veto of the Governor. The Governor's action in vetoing the bill as presented to him was based on the opinion of his then Attorney General that two sections of the Act were clearly unconstitutional on their face [14], and several other sections were of questionable constitutionality [15]. With this background we would ordinarily assume that the Governor would direct the Executive Departments to acquiesce in our declaration that certain sections of the Act are unconstitutional. However, in open court, but unfortunately off the record, counsel for the state defendants advised us that counsel could not give this Court any assurance that the state defendants would abide by a declaratory judgment. Accordingly, the record does not support an assumption on our part that the state will acquiesce in a declaratory judgment decision and, therefore, we enter injunctive relief in favor of the plaintiffs and against all defendants as to the sections of the Act declared unconstitutional.

\*　　\*　　\*　　\*　　\*　　\*

### Informed Consent

■■■ For the reasons set forth in the separate opinion filed by Judge Adams and, as to that part dealing with informed consent, joined in by Judge Newcomer, the challenged sections of the Act relating to informed consent are declared to be constitutional. I have filed a separate dissenting view.

14. Namely, Sections 3(b)(i) and 3(b)(ii).

CLIFFORD SCOTT GREEN, District Judge (dissenting as to the decision on Informed Consent).

I dissent from the decision of the Court holding the informed consent provisions of the Abortion Control Act constitutional. I believe subsections (i) and (ii) of Section 2 and the informed consent criminal sanction provisions in Section 3 are unconstitutional because the provisions invade the privacy of the physician-patient relationship and violate the Fourteenth Amendment by regulating abortions more stringently than other medically indistinguishable procedures. The Act provides in relevant part:

Section 2. Definitions. As used in this act:

·　　·　　·　　·　　·　　·

"Informed consent" means a written statement, voluntarily entered into by the person upon whom an abortion is to be performed, whereby she specifically consents thereto. Such consent shall be deemed to be an informed consent only if it affirmatively appears in the written statement signed by the person upon whom the abortion is to be performed that she has been advised (i) that there may be detrimental physical and psychological effects which are not forseeable, (ii) of possible alternatives to abortion, including childbirth and adoption, and (iii) of the medical procedures to be used. Such statement shall be signed by the physician or by a counselor authorized by him and shall also be made orally in readily understandable terms in so far as practicable.

·　　·　　·　　·　　·　　·

Section 3. Consent to Abortion; Limitations on Public Officials.

(a) No abortion shall be performed upon any person in the absence of informed consent thereto by such per-

15. Namely, the definition of "informed consent" found in Section 2, Sections 3(a), 6(f), 7, and 5(a).

son. Notwithstanding the foregoing provisions of this subsection, an abortion may be performed on any person if, in the medical judgment of a licensed physician, an abortion is immediately necessary to preserve the life of the woman and the woman is unable to give consent.

. . . . . .

(e) Whoever performs an abortion without consent as required in subsections (a) and (b) of this section shall be guilty of a misdemeanor of the first degree.

The opinion of Judge Adams states that the informed consent requirements of the Act merely codify Pennsylvania informed consent requirements, citing as authority *Dunham v. Wright,* 423 F.2d 940 (3d Cir. 1970). It is, of course, essential that the abortion procedure not be singled out for harsher regulation than other medical procedures. *Doe v. Bolton,* 410 U.S. 179, at 195–200, 93 S.Ct. 739, at 749–51, 35 L.Ed.2d 201 (1973).

I agree with Judge Adams that *Dunham* correctly sets forth the law of Pennsylvania in regard to informed consent; however, the requirements of subsections (i) and (ii) of Section 2 far exceed the informed consent requirements of Pennsylvania law as set forth in *Dunham.* The fact that the requirements of the Abortion Control Act are not merely a codification of Pennsylvania law is readily apparent when one contrasts the Pennsylvania law as set forth in *Dunham* with the requirements of the Act. Significantly, if the absolute disclosure requirement of the Act had been applied to the facts of *Dunham* an opposite holding would have been compelled.

The Third Circuit decided in *Dunham,* in an opinion by Judge Adams, that liability, as a matter of law, did not result from a failure of the surgeon to advise the patient that there was a percentage risk of death associated with the operation. In this regard, Judge Adams stated at 423 F.2d 946:

Although this omission can be a serious one, in the setting of this case it does not require us to hold as a matter of law that the defendants failed to discharge their burden of disclosure. In *Grunnagle* [Gray v. Grunnagle, 423 Pa. 144, 223 A.2d 663], the Court did not direct a verdict for the plaintiff although the record indicates that the defendant physician may have failed to inform the patient of a 10 to 15% risk that he would be worse after the operation; instead the Court said whether there was an informed consent was a question for the jury.

A reading of the Abortion Control Act clearly reveals that absolute liability civil and criminal, is imposed for the failure to give to the patient the statutorily required information. When this section is compared with the holding in *Dunham,* I believe it is erroneous to say that the Act merely codifies the Pennsylvania law on informed consent; clearly, it adds new, absolute liability requirements applicable only to the performance of an abortion.

Contrast, also, the holding in *Dunham* that consent is informed if it may be inferred from the evidence that the patient was aware of an alternative treatment even though the physician did not advise the patient of the alternative medical treatment to surgery. It is clear that under Pennsylvania law the awareness of the patient is the crucial issue. However, under the Abortion Control Act, the failure to give the required information results in liability even though the patient is clearly aware of the information and of all the alternatives. Obviously, a patient who consults a physician knows that the alternative to abortion is childbirth; indeed, it is her knowledge of this alternative which impels her to seek an abortion in the first place. Nevertheless, under the Abortion Control Act a doctor commits a crime if he fails to advise her in accordance with the Act of the alterna-

tive of childbirth. Thus, patient awareness of the alternatives is a defense to all informed consent litigation except when it arises out of the performance of an abortion.

Furthermore, in *Dunham* the Court decided the law of Pennsylvania to be that "disclosure of alternative treatment means disclosure of alternatives for the particular patient and not a recital of medical casebook theory." However, the Abortion Control Act requires the physician to recite legislative directives to his patient even if he does not believe them to be applicable to the particular patient. Such a requirement is not applicable to any other medical procedure.

In addition, the Act requires the doctor to advise all abortion patients of an alternative unconnected with medicine, i. e. adoption. I am aware of no other medical procedure where a physician is required, as a matter of informed consent, to advise a patient of a subject not included within his medical knowledge.

Finally, but most importantly, the physician is subject to criminal prosecution for failure to follow the provisions of the Act concerning informed consent. It is undisputed that only as to the performance of an abortion is failure to obtain an informed consent a crime in Pennsylvania.

Because of the aforesaid distinctions, applicable only when informed consent involves abortion, I believe the statutory provisions relating to informed consent, insofar as they require the information mandated in subsections (i) and (ii) are unconstitutional in that they single out for restriction the abortion procedure from all other similar surgical procedures and are unnecessary to protect the state's important and legitimate interest in the health of the mother. The consent provisions of subsections (i) and (ii) are invalid because they legislatively mandate the elements that are to constitute an informed consent in the abortion field; yet the state has referred the Court to no other similar medical procedure with comparable consent requirements. Moreover, the state has referred the Court to no other medical procedure which has a criminal penalty for failure to obtain an informed consent. No rational or legally cognizable basis for these distinctions has been offered. The extra layer of regulation which these provisions impose in the abortion area is unreasonably burdensome of the patients' and physicians' rights under the Fourteenth Amendment of the Constitution. Cf., *Doe v. Bolton, supra,* 410 U.S. at 195–200, 93 S.Ct. at 749–51; *Word v. Poelker,* 495 F.2d 1349, at 1351–52 (8th Cir. 1974); *Hodgson v. Anderson,* 378 F.Supp. 1008, at 1018 (D.Minn.1974); and *Friendship Medical Center, Ltd. v. Chicago Board of Health,* 505 F.2d 1141, at 1152–53 (7th Cir. 1974).

Also, it is clear under *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), that it is only at the end of the first trimester that the state's interest in maternal health becomes compelling and that the state may only regulate abortions after the first trimester if it can demonstrate that the regulation reasonably relates to the preservation and protection of maternal health. However, since the Act's informed consent requirements of subsections (i) and (ii) of Section 2 apply to the first trimester, the Act is for this reason alone inconsistent with the Supreme Court's decisions of *Roe* and *Doe. Doe, supra,* 410 U.S. at 195, 93 S.Ct. at 749.

Finally, the suggestion is made that a physician may legally satisfy subsections (i) and (ii) of Section 2, by first ritualistically following the requirements of the subsections and then negating the instructions by advising the patient he does not believe the required information is applicable to her condition. However, this process requires the physician to warn a patient of risks which he may not believe to exist and to inform the patient of alternatives, including adoption (clearly a non-medical alternative) which he may not believe to be available. Such a process is demeaning to the physician; confusing to the patient; and to some ex-

tent, deprives the patient of the honest opinion of her physician, which is essential for a meaningful consultation. No other medical procedure is so burdened.

I do not agree that the Act may be interpreted as merely requiring the giving of the requisite information and then permitting the recall of the instruction as inappropriate to the particular patient. The text of the Act does not support such an interpretation. To the extent that a physician, faced with criminal sanctions, is required to rely on such a speculative interpretation, the criminal provisions would appear to be unconstitutionally vague.

For the reasons set forth above, I would hold subsections (i) and (ii) of Section 2's definition of "informed consent", Section 3(a) of the Act to the extent that it incorporates the requirements of subsections (i) and (ii), and Section 3(e) of the Act to the extent that it applies to the requirements of Section 3(a) and subsections (i) and (ii), to be inconsistent with the Supreme Court's decisions in *Roe* and *Doe,* and therefore unconstitutional.

ADAMS, Circuit Judge (concurring and dissenting).

The court is here obliged to card the tangled fibers of protected private rights and legitimate state interests in the troubling and unclear area of abortion regulation. Powerful responses are evoked by the subject of abortion and it is open to some doubt whether the courts are the institution best equipped to resolve the complex societal interests that exist in the abortion field. Nonetheless, the courts have been thrust into that role and it is incumbent on us to adjudicate the constitutional questions presented here.

The Supreme Court in *Roe*[1] and *Doe*[2] has decreed that the state may not prohibit the exercise of a woman's fundamental right to obtain an abortion—at least in the first two trimesters. A new generation of problems was spawned in the wake of those two decisions, respecting the degree to which authority to regulate abortions, or to affect them, is retained by the state. In defending the Abortion Control Act of 1974, Pennsylvania takes the position that broad power continues to be vested in the state to monitor abortion practices. By contrast, plaintiffs maintain that *Roe* and *Doe* and their implications leave the state a more limited authority to legislate than Pennsylvania has sought to exercise.

*Roe* and *Doe* now form part of the backdrop of our law, and no purpose would be served here by discussing the arguments that have been laid to rest by those decisions. In turning to deal with the fresh problems that have arisen, we must be mindful that the acts of a popularly chosen legislature are not to be lightly invalidated—surely, not on the basis of what a court or a particular judge deems wise or desirable from the standpoint of public policy. Furthermore, we should be keenly aware that *Roe* and *Doe* were innovative decisions, and the subtlety of the ultimate fabric of law affecting abortions is perhaps not yet discernible. I am, therefore, reluctant to leap ahead too quickly to interdict states from legislating respecting abortions when, in the accumulative informed judgment of the legislators, such enactments are necessary to serve legitimate interests of the populace.

It is with such admonitions in mind that I am unable to join in the holding reached by Judge Green in the following respects: I would not conclude that the informed consent provision defined in Section 2 and required by Section 3 is unconstitutional; nor would I find unconstitutional the requirement that consent for a minor's abortion must be obtained from a parent or person in loco parentis. And although in accord with the ultimate result reached by the majority on the question of viability, it

---

1. *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

2. *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).

seems fitting to express my somewhat differing views on that issue.

## 1. *Informed Consent*

 Indisputably, informed consent would be necessary under Pennsylvania law before any medical procedure—including an abortion—may legally be performed.[3] To a considerable extent, the legislature has codified the informed consent requirement in section 3 of the Act and mandates that in the abortion field it be in writing.[4]

Plaintiffs assert that this requirement of written consent chills the right to choose to abort, and improperly interferes with the woman-physician relationship by interposing a state-ordained litany into the doctor's professional judgment regarding the information he or she finds it appropriate to tell a patient.[5]

No evidence has been adduced that persuades me that the information a doctor is requested to give under the statute would measurably chill the exercise of the abortion option. Therefore, the rational relationship test seems applicable,[6] and the burden lies with the plaintiffs to demonstrate the invalidity of this section.

Employing that test, several reasonable bases appear to justify the required informed-consent provision. There are certain practical circumstances pertaining to the delivery of abortion services that might well generate substantial concerns on the part of the legislature. Accordingly, contrary to the assertions of the plaintiffs, separate attention addressed to abortion care does not appear per se unconstitutional under the Equal Protection Clause.[7]

Rather, the separate treatment is suggested not by the choice of abortion, but by the realities of the system that provides abortions.

Abortions are frequently obtained in a specialized clinic or hospital department where a woman is removed from familiar medical surroundings. Most frequently the abortion is not done by a woman's regular doctor. The procedures, perhaps routine for those performing them, will probably be totally unlike any others theretofore undergone by the patient. In addition, as the record in this case indicates, the woman may well be experiencing considerable emotional anxiety.

Generally, the abortion decision is somewhat hurriedly arrived at and executed. It, in many cases, may be attended by a reticence that works to close off ordinary avenues of information to the patient either from friends or from family members.

The state under such circumstances might understandably wish to be certain that each woman be given the facts regarding her condition, her options, the abortion procedure to be performed, and the possible future consequences of the choice she makes. Like the licensing of facilities, the regulations, and the record-keeping provisions, the informed consent requirement may well be an attempt by the state to monitor the quality of medical care received by women procuring abortions.

To the extent the requisite information respecting the alternatives to abortion are inappropriate in any particular case, the physician is not prohibited

---

3. *Dunham v. Wright,* 423 F.2d 940 (3d Cir. 1970).

4. Parenthetically, it may be noted that the directive that the consent be in writing operates, inter alia, for the protection of the doctor against subsequent claims that informed consent was absent.

5. In *Doe v. Bolton, supra,* 410 U.S. pp. 198–200, 93 S.Ct. p. 751, Justice Blackmun criticized the practice of the State of Georgia in requiring two physicians to agree before there may be an abortion, and states that

such practice "has no rational connection with a patient's needs and unduly infringes on the physician's right to practice." However, no reference is made in the opinion to the question of informed consent as such.

6. *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

7. Plaintiffs appear to acquiesce in this, for no attack is leveled on the requirement that the consent be written.

from so indicating to the patient *en passant*. A doctor may conclude that, in his or her professional judgment, it is unlikely that a patient will experience "detrimental physical and psychological effects which are not foreseeable." [8] In that event, while telling a patient that the law requires such advice, the Act does not foreclose the physician from putting this statement in perspective for a given patient by reassurances, or by comparing the risks of other options. Proper counseling, it would appear, could incorporate the information demanded by the state and tailor the comprehensive advice to the individual case.

Whether such a provision is prudent or imprudent or whether it is wise or unwise to provide a penalty in the nature of a misdemeanor when the physician does not supply the advice in question, is not a matter for the court to decide. Rather, it is within our province to say only whether the requisite consent is in no way related to legitimate state interests. This I am unable to do.

### 2. Consent by Parent or Person In Loco Parentis for Abortion on a Minor

Plaintiffs contend that the state by requiring adult consent to the performance of an abortion on an unemancipated pregnant female under the age of 18 forges an unconstitutional veto power over a young woman's fundamental right to abort. In many cases the effect of requiring consent, the argument continues, will be to deny the right totally, at the whim of a dissident parent.

The provision is defended on the twofold basis that it serves a substantial state interest in the welfare of the minor regarding the serious decision to abort, and that it assures a parental role in the abortion choice of a child. Although I harbor some reservations regarding the latter justification for the requirement, under the statutory reading that appears reasonable to me I find the rationale adequate to sustain the restriction.

No explicit demarcation between adult and child is written in the Constitution, and it is by now clear that minors in many circumstances are vested with constitutional rights, though frequently they are not coterminus with the rights of adults. For example, *Tinker v. Des Moines School District* [9] established that students enjoy First Amendment rights of expression. *In re Gault* [10] held that fundamental due process rights appropriate to criminal proceedings must be applied in the quasi-criminal setting of a minor's delinquency hearing. And other Supreme Court decisions have clarified additional constitutional rights of minors.[11]

There are at least two legitimate interests that a state may promote in enactments respecting minors. Legislation may be upheld either as an expression by the body politic for the protection of children or in order to secure claims of parental control over the care and upbringing of children.[12]

Acting to further these ends, the state is empowered to legislate and, in some cases, to circumscribe the conduct of minors to a greater extent than it can legislate for adults.[13] Where the circumstances so require, the expression of protected rights asserted on behalf

---

8. Abortion Control Act, Act No. 209, 35 P.S. § 6602.

9. 393 U.S. 503, 514–515, 89 S.Ct. 733, 21 L. Ed.2d 731 (1969) (nondisruptive political protest). *See also West Virginia v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (salute to flag).

10. 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

11. *See, e. g., Yoder v. Wisconsin*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (religion); *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (first amendment, obscenity); *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (religion); *West Virginia v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (due process).

12. See *Ginsberg*, 390 U.S. at 639–40, 88 S.Ct. 1274.

13. *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

of minors may be curtailed or even prohibited.[14]

Beyond the freedom to determine whether and when to have a family, parents generally have broad power to make decisions affecting the schooling and religious upbringing of their offspring.[15] On occasion, the interests of the state in the minor and that of the individual parent have been at odds, and in such event the interests of both parties must then be weighed.[16]

There is no clash in the present case between the state and parent, or between the state and minor. Rather, the state seems to take a rather neutral attitude toward abortions for minors, neither prohibiting them altogether nor emancipating the minor to make the grave abortion decision without the concurrence of a responsible adult.

Plaintiffs here, on behalf of the minors, assert a right to abort as freely as an adult. While there is no Supreme Court precedent governing the result when a minor independently claims fundamental rights consented to by neither parents nor the state, it does appear from the cases that, between them, the state and parent may exercise considerable control over a minor's activities. Faced with a challenge to a state statute prohibiting minors from selling publications on the streets, the Supreme Court in *Prince v. Massachusetts*[17] upheld the statute against claims bottomed on both the First Amendment freedom of religion and on parental due process. Under *Prince*, the state would appear to have the power to delimit the exercise by minors of protected freedoms if adequate foundation exists for the state regulation.

Similarly, *Tinker* upheld the notion that special circumstances pertaining to their situation might admit of a constricted exercise of First Amendment freedoms by minors in a school setting.

The Supreme Court in *Ginsberg v. New York*[18] endorsed the concept that the scope and content of a protected right could be variable depending on whether the person asserting the right was a minor. The state statute sustained in *Ginsberg* prohibited the sale to minors of sexually explicit publications that were not obscene as to adults. The Court was careful to observe[19] that, while a sale to a minor was prohibited, parents who so desired were not precluded from making such publications available to their children. *Ginsberg* seems somewhat parallel to the present situation, where the state provides that minors may not independently seek out access to sensitive matters (lascivious publications in *Ginsberg*, abortion in the case here), but with parental permission the state maintains no further independent interest in protecting the minor. There does appear to be some precedent therefore for enabling a state to condition a minor's access to a right—protected with respect to adults—upon an adult's consent.

The consent provision in the statute before us is open to a somewhat broader interpretation than that assumed by the plaintiffs and the majority. This is so since, in addition to consent by a parent or legal guardian, the statute provides for permission to be given by a person in loco parentis. The court has been directed to no evidence indicating that a restrictive interpretation of the phrase "person in loco parentis" was intended by the legislature. It would

---

14. *Prince*, supra note 3; *Ginsberg*, supra note 3.

15. *Yoder*, supra note 3; *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (state could not prohibit private schools) ; *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (state could not prohibit the teaching of foreign languages in schools).

16. *Compare Yoder*, supra note 3 with *Prince*, supra note 3.

17. 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

18. 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1969).

19. 390 U.S. at 639, 88 S.Ct. 1274.

thus appear that consent would be acceptable from a responsible and caring adult who has a close relationship with the young pregnant woman.[20]

This more generous interpretation of the language "in loco parentis" would satisfy the interest of the legislature that the minor not be rushed into an abortion in which she was inadequately counseled, ignorant of the facts or unsupported psychologically. It would assure that some mature person with an interest in and relationship to the young pregnant · woman would participate in her decision. Requiring consent affords a reasonable means to be certain that an adult undertake a degree of responsibility for the minor's resolution to abort.

The abortion decision should be made as intelligently as possible. Inevitably, the situation is accompanied by stress and urgency. The minor is, by the very fact of age, relatively inexperienced in making decisions of the type contemplated here. There is a legitimate interest on the part of the state in protecting the physical and emotional environments of the young woman. The state may permissibly conclude that it is in the best interest of the minor to assure that an adult has helped the young person arrive at an informed judgment.[21]

Accordingly, at least as it is interpreted in this opinion, it appears to me that the requirement that a parent or person in loco parentis consent to a minor's abortion is not unconstitutional.

*3. Viability*

I agree with the majority that the term viability is not sufficiently susceptible of objective and predictable definition for criminal penalties to turn on what is necessarily an after-the-fact extrapolation whether a fetus was viable at the time of an abortion.

Nevertheless, the dilemma suggested by the result we reach today warrants some attention. Indisputably, the state has a profound interest in preserving human life, including the life of a viable but unborn fetus.[22] It therefore would seem to lie within the legitimate exercise of the police power for the state to prohibit the destruction of such viable fetal life.

Difficulty arises in formulating a criminal sanction respecting late-term abortion because, based on the record in this case, the point at which the fetus matures to viability is not universally agreed upon as a matter of medical definition. The legal definition of the instant at which life occurs to a fetus, as a standard to guide professional conduct, appears vague because it derives from a medical interpretation that lacks the specificity required for criminal sanctions.

As observed by the majority, there is a consensus regarding the applicable guidelines for determining viability—in particular the length of time since the last menses and the size of the fetus as determined by abdominal measurement of the mother. However, three principal factors render the viability definition uncertain. First, the diagnosis is not foolproof but is an estimate of fetal age. Second, whether any given fetus would survive a premature delivery cannot be ascertained in advance. Third, the evidence revealed that medical practitioners accept different statistical survival rates as determinative of viability. In the view of some of the physicians who testified, if a fetus of a certain gestational age had survived in the annals of medical history, such period set a base age for viability. For other doctors, unless a

20. "The principle is old and deeply imbedded in our jurisprudence that this Court will construe a statute in a manner that requires decision of serious constitutional questions only if the statutory language leaves no reasonable alternative." *United States v. Gambling Devices*, 346 U.S. 441, 74 S.Ct. 190, 194, 98 L.Ed. 179 (1951), at p. 448. *See also Driscoll v. Edison*, 307 U.S. 104, 105, 59 S.Ct. 715, 83 L.Ed. 1134 (1939).

21. 390 U.S. at 639, 88 S.Ct. 1274.

22. *Roe*, supra note 1; *Doe*, supra note 2.

fetus reached a size where a 10% likelihood of survival could be expected, the point of viability in their judgment, had not been achieved.

In the situation covered by the statute, until the line demarcating criminality is crossed, the conduct involved is constitutionally protected. The statute is assailed because the conduct in very many situations when performed cannot readily be identified as criminal or non-criminal.

*Grayned v. City of Rockford*[23] addressed a statute regulating picketing, allegedly defective on vagueness grounds. There the Supreme Court described the vice of vagueness as follows:

. . . Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of [those] freedoms." Uncertain meanings inevitably lead citizens to " 'steer far wider of the unlaw-

ful zone' . . . than if the boundaries of the forbidden areas were clearly marked." [24]

Until viability, a woman has a fundamental right to abort but, once having traversed the viability line, the state has a compelling interest in restricting abortion. Normal caution to avert potentially criminal activity will produce the effect of chilling the exercise of the protected right. For this reason a proscriptive statute must be narrowly drawn or else it will, as a practical matter, invade the protected right.[25]

The Pennsylvania Abortion Statute is unlike others whose broad language has been saved by repeated applications that have narrowed and supplied meaning by interpretation.[26] The problem here is not that the legal definition of the criminal behavior is broad, but that it applies a standard, viability, malleable at the time of the conduct and respecting which experts do not agree.

It is true that the Supreme Court has held that the critical mark in time for purposes of forbidding abortion is viability. Because the definition of the threshold of viability is riddled with the uncertainties cited above, however, that concept is not an adequate guide for physicians who would frequently be free to exercise their best professional judgment only at the risk of criminal penalties. To be valid, a statute should provide more objective standards, giving firmer indications of the limits of protected conduct.

### 4. Subsidization of Abortions

Before enacting the Pennsylvania Abortion Control Act, the Pennsylvania

23. 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

24. 408 U.S. at 108–09, 92 S.Ct. at 2298 (footnotes omitted), quoting *Baggett v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 12 L. Ed.2d 377 (1964) ; *Cramp v. Board of Public Instruction,* 368 U.S. 278, 287, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961).
The seminal article on vagueness is Amsterdam, "The Void for Vagueness Doctrine in

the Supreme Court," 109 U.Pa.L.Rev. 67 (1960).

25. *See for example N. A. A. C. P. v. Button,* 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

26. *See CSC v. National Ass'n. of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed. 2d 796 (1973) ; *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).

Welfare Department promulgated a regulation to the effect that only medically indicated abortions were eligible for state reimbursement under the Medical Assistance Program. A suit challenging the constitutionality of the regulation was just recently decided by the Third Circuit, in banc.[27] To the extent that the issues are identical,[28] I consider myself bound here by the law of this Circuit. My own views, which differ from those of the majority, are noted separately in *Doe v. Beale*, and it would serve no purpose to elaborate them here.

NEWCOMER, District Judge (concurring).

While the majority opinion expresses my views on most of the issues involved in this case, I feel compelled to set forth separately my views on the issues of parental and spousal consent.

The opinion of the majority, without affirming or denying the existence of any parental rights in the supervision and guidance of unemancipated minor children, finds that the act's parental consent provisions are not narrowly enough drawn to withstand constitutional challenge. While I agree with this conclusion, I am of the view that parents indeed have such rights and that the state may, within certain limitations, legislate to protect these rights. The Supreme Court has not precluded the states from legislating for that purpose and it is generally recognized that the state may abridge the constitutional rights of minors in situations where it may not abridge those of adults. See, e. g., *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). The Supreme Court has recognized the funda-

mental right of the parents to choose their children's school, *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), to choose what their children will learn, *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), and even to decide whether their children will attend school, *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). While I am not aware of any case involving a collision between the minor's rights and the parent's right to supervise the minor's upbringing, I believe that the two lines of cases discussed above permit the state to intervene to enforce parental rights.

The state's authority to preserve the right of parents to supervise their children's upbringing rests upon a larger concern: the preservation of the family as the basic unit of our society. This larger interest has been held by the Supreme Court to justify legislation which gives zoning preference to families over non-kinship groups. *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). This broader concern includes the relationship between spouses as well as the relationship between parents and children. The participation of one spouse in the important decisions of the other is equally as important to the health of the family as is the participation of the parents in the important decisions of their children.

I believe that the state may take steps to insure such participation as part of its legitimate concern with protecting and preserving the family. Such a concern was undoubtedly in the minds of the Pennsylvania legislators when they enacted the parental and spousal consent provisions of the Abortion Control Act.

---

27. *Doe v. Beale*, 3d Cir., 523 F.2d 611, 1975.

28. As to the section of the Act dealing with financing of abortions for medically indigent women by local communities, there is no mention of such possibility in the record here, and I am aware of no such action or contemplated action—at least in Pennsylvania. Accordingly, I do not consider this issue a justiciable one in the setting of this case,

and certainly it is not one that is ripe for constitutional adjudication. *See*, for example, Justice Rutledge's statement in *Rescue Army v. Municipal Court*, 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947), and Justice Frankfurter's concurring opinion in *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 156, 71 S.Ct. 624, 95 L.Ed. 817 (1951).

However, the means which they chose to insure parental and spousal participation—an unqualified veto, without the right of appeal—infringes the constitutional rights of privacy possessed by the family's individual members and is therefore unconstitutional.

That we are today invalidating the means chosen by the legislature should not be interpreted as a refutation of the legitimacy of its goals. I believe that the state could reasonably and constitutionally require a doctor who plans to perform an abortion on a married woman, or an unmarried minor, to notify and inform the husband, or at least one parent, of his plans. In this way the affected family member would be given the opportunity to fulfill his or her role as a source of guidance for, or as the partner of, the pregnant woman. But a statute which gives a parent or a husband an unappealable veto over this one medical decision far exceeds what is necessary to achieve the state's or the other family members' interest, and transgresses upon that private area secured to the woman, whether married or unmarried, adult or minor, by *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).

Moreover, the Act's parental consent provision suffers from an additional constitutional defect. We note that another Pennsylvania statute, enacted prior to the Abortion Control Act, grants to pregnant minors the right to consent to medical, dental, and health services, and establishes that such consent is effective without the consent of anyone else. 35 Purdon's Statutes § 10101. (February 13, 1970). While this law was repealed insofar as it relates to abortion procedures by the Abortion Control Act, this signaling out of abortion appears inconsistent with the Supreme Court's opinions in *Roe* and *Doe,* cited *supra.* If the Pennsylvania legislature had not granted this general unqualified right to consent to pregnant minors, or if it repealed it *en toto,* the abortion decision would merely be one, rather than the only one, of many health areas in which the parents would have the right to supervise their children.

While I share the philosophy and rationale reflected by most of the views expressed in the separate concurring and dissenting opinion of my respected colleague Judge Adams, I am unable to agree that the parental consent provision can be saved by interpreting the provision's "in loco parentis" language to embrace any "responsible and caring adult who has a close relationship with the young pregnant woman." (Adams, C. J. dissent, at p. 590). While this interpretation is reasonable in the case of orphans or those minors whose parents are mentally incompetent, unknown, or unavailable, it would not appear to be faithful to the spirit of this Act to allow a third-party to consent where the parents are able but unwilling to do so. The Courts, which under the existing provision are not permitted to adjudicate a conflict between parents and minors over the abortion decision, would have to adjudicate conflicts arising from contradictory claims by the natural parents and the person acting "in loco parentis." Moreover, this adjudication would take place not prior to the abortion, but in a criminal proceeding against the physician following the abortion. This procedure would inevitably result in restricting the consent provision to the natural parents, even if this was not the legislature's intent.

### ORDER

And now, this 4th day of September, 1975, for the reasons set forth in the Opinion accompanying this Order, it is ordered that:

(1) State defendants' motions to dismiss Planned Parenthood Association of Southeastern Pennsylvania, Concern for Health Options: Information, Care and Education, Inc., and Clergy Consultation

Service of Northeastern Pennsylvania are granted for the reasons set forth in this Court's Opinion.

State defendants' motion to dismiss the Obstetrical Society of Philadelphia is denied;

(2) The sections of the Abortion Control Act are declared to be severable, and plaintiffs' request to enjoin the Act in its entirety is denied;

(3) Section 2's definition of "informed consent", Section 3(a), Section 5(c), Section 6(a), Section 6(c), and Section 8 of the Abortion Control Act are constitutional;

(4) Section 6(d) of the Act is constitutional to the extent that it requires information concerning: "the name, address and age of the woman upon whom the abortion was performed; the date on which the abortion was performed; the date upon which the determination of pregnancy as required by this section was made; . . .; the approximate age, in months, of the fetus; . . . Affixed to such statement shall be a copy of each of the documents showing consent to abortion as required by Section 3 of this act. All information and documents required by this subsection shall be treated with confidentiality customarily accorded to medical records.";

(5) Section 6(d) of the Act is unconstitutional to the extent that it requires information concerning: "the name and address, if known, of the spouse of the woman; the name and address, if known, of the parent or person in loco parentis if the woman is under eighteen years of age and unmarried; . . .; a full statement of those facts upon which the person performing the abortion relied as establishing that the abortion was necessary to preserve the life or health of the mother.";

(6) Section 2's definition of "viable", Section 3(b)(i), Section 3(b)(ii), Section 5(a), Section 6(b), Section 6(f) are unconstitutional; and Section 7 of the Abortion Control Act is inconsistent with Title XIX of the Social Security Act and is unconstitutional; and,

(7) The defendants, their agents, their employees, successors in interest, and all others acting in concert with them, are enjoined from the enforcement of the sections of the Act that have been held by this Court to be unconstitutional.